**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-1021**

SHANE FELDMAN; BRIAN KELLY; PAUL SINGLETON,

Plaintiffs - Appellees,

v.

PRO FOOTBALL, INCORPORATED; WFI STADIUM, INCORPORATED,

Defendants - Appellants.

**No. 09-1023**

SHANE FELDMAN; BRIAN KELLY; PAUL SINGLETON,

Plaintiffs - Appellants,

v.

PRO FOOTBALL, INCORPORATED; WFI STADIUM, INCORPORATED,

Defendants - Appellees.

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Alexander Williams, Jr., District Judge. (8:06-cv-02266-AW)

Argued: March 25, 2010          Decided: March 25, 2011

Before MICHAEL and DAVIS, Circuit Judges, and James A. BEATY, Jr., Chief United States District Judge for the Middle District of North Carolina, sitting by designation.

---

Affirmed by unpublished per curiam opinion. Judge Beaty wrote a separate opinion dissenting in part.

---

**ARGUED:** Roger William Yoerges, STEPTOE & JOHNSON, LLP, Washington, D.C., for Appellants/Cross-Appellees. Joseph B. Espo, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Appellees/Cross-Appellants. **ON BRIEF:** Kathryn J. Gainey, STEPTOE & JOHNSON, LLP, Washington, D.C., for Appellants/Cross-Appellees. Marc P. Charmatz, Rosaline Crawford, NATIONAL ASSOCIATION OF THE DEAF, Law And Advocacy Center, Silver Spring, Maryland, for Appellees/Cross-Appellants.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Defendants Pro Football, Inc. and WFI Stadium, Inc. operate, respectively, the Washington Redskins football team and FedEx Field, where the Redskins play home games. Plaintiffs are three individuals who are deaf or hard of hearing and who regularly attend Redskins games at FedEx Field. Plaintiffs argue that the Americans with Disabilities Act (ADA) obligates defendants to provide auxiliary access to the content of broadcasts from FedEx Field's public address system. Soon after plaintiffs filed their complaint, defendants captioned most of the aural content to which plaintiffs seek access. The district court nevertheless held that the case was not moot and granted summary judgment to plaintiffs.

The district court's holding rested in part on the fact that defendants were not providing plaintiffs with access to the lyrics to music played over the stadium's public address system. Defendants appeal the district court's summary judgment ruling that the ADA requires them to provide plaintiffs with auxiliary access to the aural content broadcast over the public address system, including music lyrics. They ask this court to decide whether deaf and hearing-impaired game spectators require access to music lyrics in order to fully and equally enjoy defendants' goods, services, privileges, and facilities. Whatever the poetic merit of the lyrics and their relevance to

3

the sport of football,[1] we agree with the district court that the music played over the public address system during Redskins home games is part of the football game experience that defendants provide as a good or service, and that the ADA requires full and equal access to the music lyrics. Accordingly, we affirm the district court's declaratory judgment requiring defendants to provide auxiliary access to the aural content broadcast over FedEx Field's public address system. We also affirm the district court's holding that plaintiffs' complaint cannot be construed as requesting auxiliary access to aural content that is not broadcast over the public address system, including the content of a separate radio program.

I.

A.

Plaintiffs Shane Feldman, Brian Kelly, and Paul Singleton are Maryland residents who regularly attend Washington Redskins football games at FedEx Field in Landover, Maryland. They are deaf or hard of hearing to a degree that renders them unable to benefit from assistive listening devices. Defendant

---

[1] Defendants' "Half-Time Mix" includes lyrics like "Y'all don't really want it but the young got time / With a flow so spec like . . . technologic / Shawty get loose, baby do what you do, let me see you let down your hair." Lil' Mama, "Shawty Get Loose" (Jive Records 2008). J.A. 586.

4

Pro Football, Inc. is a Maryland corporation that owns and operates the Redskins. Defendant WFI Stadium, Inc. is a Delaware corporation that owns and operates FedEx Field, where the Redskins play home games. FedEx Field seats more than 91,000 fans. Defendants have always provided assistive listening devices to spectators who are hard of hearing, but the 2006 football season marked the first time that defendants captioned announcements made over the stadium's public address system. This change was prompted by communications between defendants and plaintiff Feldman. Feldman first emailed defendants in 2003, introducing himself as a season ticket holder who was deaf and unable to benefit from assistive listening devices. Feldman explained that during the games he was "often at a loss" when the referees called penalties and that he was unable to catch the number of the player who just made a play. J.A. 94. His email also mentioned an incident involving pepper spray during a 2002 night game when he was unable to understand the stadium's emergency announcement. Feldman asked defendants to consider captioning the Jumbotron at FedEx Field.

Feldman maintained correspondence with defendants in 2004 regarding possible auxiliary aids. Defendants did not want to caption the Jumbotron because doing so would take up one-third of the screen, significantly reducing the remaining video

5

portion. As an alternative, defendants proposed hand-held captioning devices. Feldman responded that spectators who are deaf or hard of hearing would not be pleased with these devices, in part because of reported time delays between announcements and the appearance of the captions and the nuisance of having to glance repeatedly from the device to the field. In February 2006 the National Association of the Deaf (NAD), on behalf of Feldman, wrote to defendants and explained that as a place of public accommodation under the ADA, FedEx Field had a legal obligation to afford full and equal enjoyment of its goods, services, facilities, and privileges to spectators who are deaf or hard of hearing. The NAD demanded that defendants caption the stadium's public address system announcements on the "scoreboards/Jumbotrons." J.A. 101. Specifically, the NAD demanded captioning of "anything that is said by the referee, the public address announcer, or anyone else using the public address system." Id.

Plaintiffs sued defendants on August 31, 2006. The complaint alleged that defendants were violating Title III of the ADA by refusing to caption the Jumbotrons and video monitors at FedEx Field. Plaintiffs requested a declaratory judgment that defendants were violating the ADA and an injunction requiring defendants to "provide individuals with disabilities equal access to the benefits of [defendants'] facilities,

6

programs, services, and activities." J.A. 16. Specifically, plaintiffs asked the court to order defendants to "provide and display captioning on the Jumbotrons and video monitors at FedEx Field for all announcements made over the public address system, including all of the plays that just occurred, all of the penalties called, safety and emergency information, and any other announcements made over the public address system." Id.

The first Redskins home game of the 2006 season was on September 11, 2006. During the first game the only content broadcast over the public address system that defendants captioned was an emergency evacuation video. However, defendants started captioning game information shortly thereafter at the third Redskins home game on October 15, 2006, just over a month after being served with the complaint. After receiving Feldman's criticisms of the hand-held captioning devices in 2004, defendants had explored other options. They decided to provide most of the captioning on FedEx Field's two light-emitting diode ribbon boards (LED boards) rather than on the Jumbotrons. The LED boards are located on each side of the stadium at the fifty-yard line and are visible from almost every seat. Defendants hired a stenographer, Stephen Clark, as an independent contractor to provide the captioning.

During the October 15 home game defendants captioned a considerable amount of game information and other announcements.

7

On the LED boards defendants captioned: (1) a pre-game announcement encouraging the fans to cheer; (2) after each play an announcement stating the type of play, the names of the key players involved, the number of yards gained or lost, the yard line location of the ball, the down, and the number of yards remaining until first down; (3) two-minute warning announcements and announcements that the quarter had ended; (4) the referee's penalty explanations; (5) announcements that cheerleaders were entering the field; (6) announcements regarding check presentations and other non-musical entertainment during breaks and halftime; (7) public service announcements and advertising; and (8) the announcement of the game's end, along with the final score and information regarding the next home game. On the Jumbotrons located in the stadium bowl, defendants captioned an emergency evacuation video played before the game. Additionally, defendants provided captioning in the concourse areas of the stadium so that spectators who are deaf or hard of hearing would not lose track of what was occurring on the field when using the restroom or buying refreshments. The concourse areas contain around 150 televisions, half of which caption the network broadcast from the field while the other half display the Jumbotron video feed. Defendants continue to provide this captioning, and they represent to this court, just as they did to the district court, that they will do so indefinitely.

8

Three months after filing their complaint, plaintiffs retained expert Lawrence Goldberg. Goldberg founded the National Center for Accessible Media, a research center dedicated to making new media technologies accessible to persons with disabilities. Goldberg attended a Redskins home game in December 2006 and wrote a report that analyzed the captioning that defendants were providing and recommended captioning of additional aural programming, including lyrics to songs played for entertainment and a radio program (the Red Zebra program) that is broadcast in the concourse areas and is separate from the public address system broadcast. Goldberg based his recommendation on the principle that "if there is spoken or performed speech, or essential non-speech information provided via audio systems, a usable text-equivalent should be provided for people who cannot fully perceive such audio." J.A. 399. As he explained in his deposition: "[I]f audio is heard by a hearing person, then it has some reason for being projected; and, therefore, a deaf person should have equal access to that." J.A. 337.

## B.

Defendants moved for summary judgment in January 2008, and plaintiffs cross-moved for summary judgment in February 2008. Defendants contended that the case was moot because they were captioning game and emergency information as requested in

9

the complaint and would do so indefinitely. Plaintiffs responded that there remained a live controversy because defendants could, with the "flip of a switch," return to violating the ADA. J.A. 109. Further, plaintiffs alleged that defendants continued to violate the ADA by failing to caption music lyrics and the Red Zebra radio program. Plaintiffs also maintained that defendants were not providing full aural accessibility because the LED board captions were not in the same line of sight as the Jumbotrons, but they abandoned this claim after the summary judgment hearing. Defendants urged that the court could not grant relief on the captioning of music lyrics and the radio program because these claims were outside the scope of the complaint and were raised for the first time in plaintiffs' summary judgment motion.

The district court concluded that plaintiffs' case was not moot because defendants' voluntary provision of captioning did not satisfy the heavy burden of showing no reasonable expectation that the alleged ADA violations would recur. On the issue of which alleged ongoing violations were within the scope of the complaint, the district court concluded that plaintiffs' request for captioning music lyrics, but not their request for captioning the radio program, was encompassed in the complaint. The court relied upon the ongoing disputes regarding the

10

captioning music lyrics and the line-of-sight positioning of the LED captions to bolster its holding that the case remained live.

On the substance of the ADA claim, the district court awarded summary judgment to plaintiffs and held that the ADA requires defendants to provide auxiliary aids for the aural content broadcast over FedEx Field's public address system, including music lyrics. The court found it undisputed that the Redskins could provide auxiliary access to the music lyrics without undue burden. Because the ADA does not dictate a particular auxiliary aid, the court declined to issue an injunction requiring captioning as the means of access for the music lyrics. Plaintiffs do not appeal this portion of the district court's ruling. Pursuant to the district court's order defendants make available typed copies of the lyrics to plaintiffs by email before each game.

II.

On appeal defendants maintain that the district court erroneously held (1) that plaintiffs' claims were not moot and (2) that the ADA requires defendants to provide auxiliary aids for aural content broadcast over FedEx Field's public address system. Defendants take particular issue with the court's conclusion that the ADA requires them to furnish plaintiffs with access to the lyrics to music that is played over the public

11

address system.  Plaintiffs cross appeal, arguing that the district court wrongly construed their request for captioning the radio program as outside the scope of the complaint. Alternatively, plaintiffs contend that their request for captioning the Red Zebra radio program was tried by consent of the parties.  We affirm the district court's order in its entirety.

A.

We first address defendants' assertion that plaintiffs' claims are moot.  We review the district court's ruling on constitutional mootness de novo.[2]  <u>Green v. City of Raleigh</u>, 523 F.3d 293, 298 (4th Cir. 2008).  A "case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969).  "Litigation may become moot during the pendency of an appeal."  <u>Incumaa v. Ozmint</u>, 507 F.3d 281, 286 (4th Cir. 2007).  "The requisite personal interest that must exist at the commencement of the litigation . . . must continue throughout its existence."  <u>United States Parole Comm'n v. Geraghty</u>, 445 U.S. 388, 397 (1980) (quoting Henry P.

---

[2] The district court also held that plaintiffs' claims were not prudentially moot.  Defendants do not challenge this holding.

Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)).

A case may remain live even if the events giving rise to the lawsuit cease. The "voluntary discontinuance of challenged activities by a defendant does not necessarily moot a lawsuit." United States v. Jones, 136 F.3d 342, 348 (4th Cir. 1998). The exception to this general rule is when there is "no reasonable expectation that the wrong will be repeated." Lyons P'Ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 800 (4th Cir. 2001) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953) (emphasis added)). "But this exception is just that – an exception – and defendants 'face a heavy burden to establish mootness in such cases because otherwise they would simply be free to return to [their] old ways' after the threat of a lawsuit has passed." Id. (quoting W.T. Grant, 345 U.S. at 632).

While we commend defendants for providing most of the relief that plaintiffs requested and for engaging with plaintiffs on the benefits and burdens of particular auxiliary aids, we agree with the district court that defendants have not discharged their heavy burden of showing no reasonable expectation that they will repeat their alleged wrongs. Although defendants were investigating possible auxiliary aids years before plaintiffs' lawsuit, they did not actually provide

13

captioning until after plaintiffs filed their complaint.  See Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1184 (11th Cir. 2007) (noting that "whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit" is relevant to the voluntary cessation analysis).  Further, this is not a case in which plaintiffs "control[] [their] own fate."  Incumaa, 507 F.3d at 289.  Defendants maintain complete control over the captioning. They hired one stenographer, Stephen Clark, as an independent contractor to provide the captioning.  If Clark for some reason cannot provide his services at a Redskins home game, he arranges for another certified stenographer to take his place.  Given the ease with which defendants could stop providing captioning, we simply cannot say that they have made an affirmative showing that the continuation of their alleged ADA violations is "nearly impossible."  Lyons, 243 F.3d at 800; see also Tandy v. City of Wichita, 380 F.3d 1277, 1291 (10th Cir. 2004) (observing in an ADA case that defendants' heavy burden under the voluntary cessation doctrine is "typically . . . met only by changes that are permanent in nature and that foreclose a reasonable chance of recurrence").

Equally important is the continued existence of a live dispute over captioning music lyrics at Redskins games.  The district court construed plaintiffs' complaint to encompass a

14

request for captioning of music lyrics. Because defendants had not provided auxiliary aids for the lyrics, the court concluded that this issue also remained live. As explained below, we agree with the district court's construction of the complaint and therefore hold that plaintiffs' case was not moot when the court ruled on the parties' summary judgment motions, nor is the case moot before this court. Ramer v. Saxbe, 522 F.2d 695, 704 (D.C. Cir. 1975) ("A case is not moot so long as any single claim for relief remains viable, whether that claim was the primary or secondary relief originally sought.") (citing Powell, 395 U.S. at 496-97).

Defendants argue that even if plaintiffs' request for captioning music lyrics is a live claim, this request must be separated for mootness purposes from captioning emergency and game-related information that defendants are voluntarily providing. Because we agree with the district court that defendants have not shown that a continuation of their alleged ADA violations is nearly impossible, we likewise treat all of plaintiffs' requested relief as presenting a live claim.

B.

We now turn to the district court's interpretation of plaintiffs' complaint. Federal Rule of Civil Procedure 8(a) requires a "pleading that states a claim for relief" to include "a short and plain statement of the claim showing that the

15

pleader is entitled to relief" and "a demand for the relief sought, which may include relief in the alternative or different types of relief."  The statement of the claim must give the defendant "fair notice" of the claim and the "grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  Id.  "Factual allegations must be enough to raise a right to relief above the speculative level."  Id.

Plaintiffs did not explicitly request that defendants caption the music lyrics accompanying the football game; this specificity appeared for the first time in plaintiffs' summary judgment motion.  Although the complaint never explicitly mentions music lyrics, it does refer repeatedly to "announcements made over the public address system" and "captioning on the Jumbotrons and video monitors."  J.A. 8, 10, 11, 12, 15, 16.  Besides requesting captioning of "plays that just occurred," "penalties called," and "safety and emergency information," plaintiffs requested captioning of "any other announcements made over the public address system."  J.A. 16.  The complaint also referred to "equal access to the information . . . made over the public address system."  J.A. 15.  Music is part of the aural content that defendants broadcast on FedEx Field's public address system.  By repeatedly referring to the "public address system," plaintiffs gave defendants fair notice

16

that they were seeking as much auxiliary access as possible to the football game as experienced from the stadium bowl, an experience which includes music.

C.

Before turning to defendants' argument on the merits of plaintiffs' ADA claim, we dispose of plaintiffs' cross-appeal challenging the district court's holding that the complaint did not encompass a request for captioning the Red Zebra radio program. As with the music lyrics, plaintiffs did not specifically mention captioning the radio program until they moved for summary judgment. Unlike the music lyrics, however, the Red Zebra program is not part of the aural content broadcast over FedEx Field's public address system, which plaintiffs did repeatedly reference in their complaint. The Red Zebra program is a separate broadcast heard only in FedEx Field's concourse areas, and it includes different commentary than what is heard in the stadium bowl. Although the complaint refers to the "video monitors located in the concession areas," J.A. 10, it describes the content on the monitors to which plaintiffs sought access as the "announcements made over the public address system." J.A. 16. The complaint describes the purpose of the concourse monitors as "enabl[ing] attendees to keep track of events on-field when they are not in their seats." J.A. 10. Because the requested relief focuses on what is broadcast from

17

the field, the district court properly held that plaintiffs' request for captioning the Red Zebra program was outside the scope of the complaint and could not be sought at the summary judgment stage.

Plaintiffs argue that even if their complaint cannot be construed to encompass captioning the radio program, this issue was tried by implied consent of the parties under Federal Rule of Civil Procedure 15(b)(2). Rule 15(b)(2) provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." "Because notice to the defendant of the allegations to be proven is essential to sustaining a cause of action, Rule 15(b) applies only when the defendant has consented to trial of the non-pled factual issues and will not be prejudiced by amendment of the pleadings to include them." Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 901 (4th Cir. 1996). The plain language of Rule 15(b)(2) suggests that the non-pled issue must have gone to trial. The rule "is designed to allow amendment of a pleading when the facts proven at trial differ from those alleged in the complaint, and thus support a cause of action that the claimant did not plead." Id. (emphasis added).

Courts of appeals are split regarding whether Rule 15(b)(2) applies at the summary judgment stage. See Ahmad v.

18

Furlong, 435 F.3d 1196, 1203 n.1 (10th Cir. 2006) (noting circuit split). In People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 367 (4th Cir. 2001), we affirmed a district court's grant of summary judgment on an issue raised for the first time in the plaintiffs' motion for summary judgment. We found that although the district court did not allow formal amendment of the complaint to include the plaintiffs' subsequently raised claim, the court recognized constructive amendment of the complaint by granting summary judgment in the plaintiffs' favor on the non-pled issue. Id. at 367-68.

Here, in contrast, the district court declined to grant summary judgment on plaintiffs' radio station claim because it found that defendants did not consent to trial of that claim. The court in Doughney found that the defendant had fair notice of the non-pled claim because although the defendant objected to plaintiffs' belated claim, the defendant "also vigorously defended against the claim." Id. at 367.

Because defendants here merely objected to plaintiffs' raising the radio program at the summary judgment stage, and did not vigorously defend against it, they did not essentially try or litigate the issue. In their response to plaintiffs' summary judgment motion, defendants focused primarily on their argument that the radio program was not raised in the complaint and

19

therefore could not be used to avoid mootness. Moreover, the bulk of that mootness argument focused on the undisputed fact that defendants were already captioning play-by-play information from the field in the concourse areas. Defendants' only response to the Red Zebra program specifically, other than their general assertion that the ADA does not require captioning the program, was a footnote observing that none of plaintiffs claimed to read the captioned coverage from the field while in the concourse areas. Thus, defendants maintained that there was no factual basis for plaintiffs' argument that "the content of the radio broadcast is superior to that provided by the television network broadcasters." J.A. 21 (emphasis in original). This does not amount to a vigorous defense against providing auxiliary access to the Red Zebra program.

Plaintiffs also argue that implied consent may be found in defendants' failure to object to the introduction of evidence relevant to the request for captioning the Red Zebra program, namely Goldberg's expert report that recommended captioning the program. However, as the Ninth Circuit has said, although "a party's failure to object to evidence regarding an unpleaded issue may be evidence of implied consent to trial of an issue, it must appear that the party understood the evidence was introduced to prove the unpleaded issue." Campbell v. Bd. of Trs. of Leland Stanford Junior Univ., 817 F.2d 499, 506 (9th

20

Cir. 1987).  There is no indication of such an understanding on this record.

D.

Defendants challenge the district court's holding requiring them to provide auxiliary aids that enable "equal access to the aural information broadcast over the stadium bowl public address system at FedEx Field."  J.A. 578.  The court defined the aural information as the "music with lyrics, play information, advertisements, referee calls, safety/emergency information, and other announcements."  Id.  Defendants contend this sweeps far broader than what the ADA requires, particularly with regard to the lyrics to music broadcast over the stadium's public address system.

Title III of the ADA mandates that individuals who visit places of public accommodation like FedEx Field may not "be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a).  Title III defines discrimination in part as the

> failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally

21

alter the nature of the good, service, facility, privilege . . . or would result in an undue burden.

Id. § 12182(b)(2)(A)(iii). A Department of Justice (DOJ) regulation implementing Title III further provides that "a public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

Defendants do not contend that captioning the aural information described in the district court's order would constitute a fundamental alteration or an undue burden. Our inquiry is therefore limited to whether the ADA requires defendants to provide auxiliary aids for the aural content broadcast over the stadium bowl's public address system in order to provide plaintiffs with "full and equal enjoyment" of defendants' goods, services, facilities, and privileges. Id. § 36.201(a). Neither the ADA nor the regulations implementing the ADA impart guidance on the specific content that places of public accommodation must communicate to individuals who are deaf or hard of hearing. The DOJ's Technical Assistance Manual for Title III indicates that the type of auxiliary aid that ensures "effective communication" varies by context. U.S. Dep't of Justice, Civil Rights Division, The Americans with Disabilities Act: Title III Technical Assistance Manual III-4.3200. The regulation contemplates that, like the type of

22

auxiliary aid, the content that must be communicated by auxiliary aids is also context-sensitive. What constitutes "full and equal enjoyment" of a place of public accommodation's goods, services, facilities, and privileges necessarily varies based on what the place provides to visitors and consumers.

We agree with the district court that in the context of a professional football game at a large stadium like FedEx Field, effective communication requires defendants to provide auxiliary aids beyond assistive listening devices, which are useless to plaintiffs, to convey the: (1) game-related information broadcast over the public address system, including play information and referee calls; (2) emergency and public address announcements broadcast over the public address system; and (3) the words to music and other entertainment broadcast over the public address system. Plaintiffs need access to this aural content to have full and equal access to the goods and services that defendants provide at FedEx Field.

To resolve the issue, we must determine the goods and services defendants provide. First and foremost, defendants provide a live football game at FedEx Field. For plaintiffs to enjoy a game on a level as equal as possible with hearing spectators, they must be able to access, in both the stadium bowl and concourse areas, the game-related information broadcast over the public address system. Title III of the ADA also

23

requires defendants to provide auxiliary aids for the content of emergency information, advertisements, and public service announcements broadcast over the stadium bowl's public address system. Without auxiliary aids that provide emergency information, spectators with disabilities are almost certain to experience more stress in an emergency than hearing spectators. Knowing that understandable instructions will accompany an emergency, then, is necessary to the full and equal enjoyment of the game. Advertisements and public service announcements are also part of the services and privileges that defendants provide because they communicate to spectators a message about the Redskins' stature and recognition among businesses and other organizations. Advertisements communicate which entities support the Redskins. Public service announcements indicate which causes the Redskins support and how spectators might become involved in those causes.

We also agree with the district court that defendants "provide more than a football game." J.A. 577-78. They provide an entertainment experience. This experience includes aural and visual components that, although not part of the game action, play an important role in generating support for the game and promoting spectator attendance. Full and equal enjoyment of defendants' goods, services, privileges, and facilities includes aural access to the lyrics to music broadcast over the stadium

24

bowl's public address system. Without this access plaintiffs are "otherwise treated differently" because of the "absence of auxiliary aids." 42 U.S.C. § 12182(b)(2)(A)(iii). Music played during a football game arouses enthusiasm and fosters a sense of shared participation. The lyrics may be nonsensical, as defendants point out, but even nonsensical lyrics may enhance the environment of collective excitement that defendants provide as part of their goods and services. By having access to the lyrics, plaintiffs have the opportunity to participate in the communal entertainment experience. Without access to lyrics played, for example, during cheerleader dance routines and the halftime show, plaintiffs would not fully and equally experience the planned and synchronized promotional entertainment that large stadiums like FedEx Field provide.

In holding that defendants must provide access to the lyrics, we emphasize that, like the district court, we do not require the auxiliary aids and services to take a particular form. When an auxiliary aid of some kind is required, the regulations acknowledge (1) that the type of aid necessary for effective communication inevitably will vary with context and (2) that "[t]he auxiliary aid requirement is a flexible one." 28 C.F.R. pt. 36 App. B. What is more, "full and equal enjoyment" is not so capacious as to "mean that an individual

with a disability must achieve an identical result or level of achievement as persons without a disability." Id.

The DOJ's rulemaking activity does not alter this result. The DOJ issued a Notice of Proposed Rulemaking in June 2008 regarding the issue of captioning at sports stadiums. The notice announced the DOJ's awareness "that individuals who are deaf or hard of hearing have expressed concern that they are unaware of information that is provided over the public address systems" at sports stadiums with a capacity of 25,000 or more. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 73 Fed. Reg. 34508, 34531-32 (proposed June 17, 2008). The DOJ therefore proposed that large stadiums "provide captioning for patrons who are deaf or hard of hearing for safety and emergency information announcements made over the public address system." Id. at 34532. The notice also announced the DOJ's awareness that several major stadiums, including FedEx Field, "currently provide open captioning of all public address announcements, and do not limit captioning to safety and emergency information." Id. The notice solicited comments on "the effect of a requirement to provide captioning for patrons who are deaf or hard of hearing for game-related information (e.g., play-by-play information), safety, and emergency announcements, and any other relevant announcements." Id.

26

On July 23, 2010, after oral argument in this case, the DOJ issued final rules enforcing the accessibility standards of Title III of the ADA. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 28 C.F.R. § 36, available at http://www.ada.gov/regs2010/titleIII_2010/titleIII_combined.html. With respect to the issue of captioning of "all public address announcements," rather than simply "safety and emergency information," the DOJ elected to "postpone rulemaking on this complex issue." Id. The DOJ based this decision on "a number of factors, including the multiple layers of existing regulations by various state agencies and levels of government, and the wide array of information, requests, and recommendations related to developing technology by the public." Id. Thus, the DOJ "concluded that further consideration and review is prudent before it issues specific regulatory requirements." Id.

Defendants maintain that the DOJ's solicitation of input and postponement of rulemaking on this issue indicates that the DOJ does not interpret the ADA to require large stadiums to provide auxiliary access to game-related information, let alone music lyrics. We disagree. This action demonstrates the DOJ's alertness to problems like those experienced by plaintiffs. It does not preclude the conclusion that the ADA requires defendants to provide auxiliary access to

27

more than just safety and emergency information. The earlier notice of proposed rulemaking explicitly contemplated that the ADA may require captioning of game-related information and "any other relevant announcements." Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 73 Fed. Reg. at 34531-32. The DOJ is continuing to evaluate the effect of such a requirement. This evaluation raises the possibility that the requirement could pose an undue burden for some stadiums, or that it could fundamentally alter a stadium's goods and services, thus providing defenses to what the ADA otherwise requires. The DOJ's action does not, however, indicate that large stadiums like FedEx Field need only furnish, at most, auxiliary access to play-by-play game information. The notice cited play-by-play information as one example of game-related information and mentions "other relevant announcements," leaving open the possibility that spectators who are deaf or hard of hearing must have auxiliary access to the promotional and entertainment content of a stadium bowl's public address system in order to fully and equally enjoy the goods, services, facilities, and privileges of the stadium.

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

BEATY, Chief District Judge, dissenting in part:

I respectfully dissent from the majority opinion to the extent that it affirms the scope of the declaratory judgment entered by the district court in this case. In my view, the district court in this case erred by announcing a broad declaratory judgment that required "equal access" to all "aural content" at FedEx Field, rather than focusing on whether the auxiliary aids provided by Defendants were sufficient to ensure "effective communication." By setting out an "equal access to aural content" standard, the district court set out a rule that would potentially require that all content broadcast over the public address system at an athletic event at a public stadium be captured and provided to deaf or hearing impaired individuals in order to comply with the ADA, even though the ADA itself does not include such a requirement, instead of following the "auxiliary aid" analysis set out in the applicable statutory and regulatory provisions.

The Americans with Disabilities Act prevents discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Under the statute, a place of public accommodation must take necessary steps to ensure that hearing-impaired individuals are not "excluded, denied services, segregated or

30

otherwise treated differently than other individuals <u>because of the absence of auxiliary aids and services</u>," unless such steps would result in an undue burden or fundamental alteration in the nature of the good, service, facility or privilege. 42 U.S.C. § 12182(b)(2)(A)(iii) (emphasis added). The Department of Justice regulations that implement these provisions state that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c). "The term 'auxiliary aids and services' includes . . . [q]ualified interpreters, notetakers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 26 C.F.R. § 36.303(b). The Department of Justice has noted that "[t]he auxiliary aid requirement is a flexible one. . . . [T]he Department believes that Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability." 28 C.F.R. part 36, App. B, Sec. 36.303. Thus,

31

"[a] public accommodation can choose among various alternatives as long as the result is effective communication." Id.

Under these statutory and regulatory provisions as they relate to hearing-impaired individuals, public accommodations should follow a three-step process: (1) a public accommodation must provide auxiliary aids where necessary to ensure effective communication; and (2) if this requirement is triggered and auxiliary aids are needed to ensure effective communication, the public accommodation can choose what auxiliary aids are provided as long as the result is effective communication; but (3) the public accommodation need not provide an auxiliary aid or service if it would result in an undue burden or fundamental alteration. Thus, the relevant focus is on whether auxiliary aids are needed for, and result in, "effective communication."

In the present case, under this analysis, the first question is whether an auxiliary aid or service of some type must be provided to ensure effective communication at FedExField. If so, the analysis then moves to the second step: whether the auxiliary aids chosen by Defendants result in effective communication. In this regard, there were two types of auxiliary aids or services offered by Defendants in this case. First, there is no dispute that Defendants have been providing assisted-listening devices as an auxiliary aid or service since 1997. However, there is also no dispute that

32

those devices did not benefit Plaintiffs due to the nature of Plaintiffs' hearing impairments. Second, after this suit was filed, Defendants attempted to address Plaintiffs' concerns by providing auxiliary aids that included captioning on the LED boards at the 50-yard line of all public service announcements, play calls, game announcements, emergency announcements, and other announcements and information broadcast over the public address system, in addition to captioning of the video feeds in the concession areas.[1] However, the professional stenographer/captioner providing the captioning did not caption the lyrics to songs, because he testified that he followed the "industry standard" of not captioning song lyrics due to difficulty in understanding and correctly captioning the lyrics, and because the software that he used did not allow him to "prescript" the lyrics in advance. (Stephen Clark Dep., J.A.-0433 to JA-0434).

Before the district court, Defendants disputed whether the ADA required them to provide deaf and hard of hearing fans with any type of auxiliary aids and services beyond the assistive-listening devices in order to ensure effective communication. The district judge properly rejected this contention, finding

---

[1] Defendants also offered the possibility of a hand-held captioning system. However, Plaintiff Feldman rejected this option and the district court did not consider whether this type of auxiliary aid would result in effective communication.

that the assistive-listening system provided by Defendants did not result in effective communication for Plaintiffs, and further finding that simply watching the game without any auxiliary aid or service did not provide effective communication. These findings rightly would have supported a declaratory judgment that an auxiliary aid of some type must be provided by Defendants beyond the assistive-listening devices, unless undue burden or fundamental alteration could be established.

However, the district court went beyond this analysis, and rather than declaring that an auxiliary aid of some type was necessary for effective communication, the district court instead declared that "the ADA requires Defendants to provide deaf and hard of hearing fans equal access to the aural information broadcast over the stadium bowl public address system at FedExField." The district court then specifically concluded that the ADA requires Defendants to provide auxiliary aids with respect to the lyrics to the songs played during the cheerleader's dance routines. On this point, the district court did not consider whether the captioning system being provided by Defendants resulted in effective communication as a whole, and instead created a separate analysis focusing on "equal access" to a particular communication. While the ADA provides for "full and equal enjoyment" of the services at a place of public

34

accommodation, the primary obligation is to furnish auxiliary aids and services that provide an "effective method" of communication. Thus, the district court's focus on providing "equal access" to the "aural content" but failure to evaluate whether the auxiliary aids actually provided resulted in "effective communication" goes beyond the regulatory framework.[2]

In addition, the district court's failure to consider whether the auxiliary aids that were provided resulted in effective communication left the second step in the analysis unanswered. The Complaint in this case specifically requested that all public announcements be captioned on the JumboTrons, not the LED boards, but the district court did not consider whether the auxiliary aid of captioning on the Jumbotrons, as requested, was necessary for effective communication, nor did

_____

[2] The Department of Justice Technical Assistance Manual includes a reference to "equal access." However, the Technical Assistance Manual explains that "[i]n order to provide equal access, a public accommodation is required to make available appropriate auxiliary aids and services where necessary to ensure effective communication." Thus, even under the Technical Assistance Manual, the obligation is framed in terms of "effective communication." The Technical Assistance Manual further notes that "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the length and complexity of the communication involved" and "the ultimate decision as to what measures to take to ensure effective communication rests in the hands of the public accommodation, provided that the method chosen results in effective communication." U.S. Dep't of Justice, Civil Rights Division, The Americans with Disabilities Act: Title III Technical Assistance Manual III-4.3200.

the district court consider whether the auxiliary aid provided by Defendants of captioning on the LED boards resulted in effective communication. The district court did conclude that a trial was necessary on one issue related to the LED captioning, specifically, the "line of sight" issue regarding the location of the LED boards, but that issue was subsequently dropped by the Plaintiffs. Thus, the only issue remaining related to the song lyrics, for which the district court concluded that "equal access" was required, apart from any analysis of the auxiliary aids that were being provided. Thus, the ultimate issues raised in this case were not addressed, leaving ongoing questions regarding the impact of the district court's Judgment.[3]

In my view, the auxiliary aids provided here, i.e., the captioning that was provided on the LED boards and in the concourse area, were sufficient to result in effective communication, even if Defendants did not provide word-for-word captioning of the songs in the cheerleader's dance routines. Of

---

[3] The difficulty in this conclusion is exemplified by the ultimate result here: the district court ruled that "equal access" to the lyrics of the dance routines must be provided, and Defendants have therefore been providing the lyrics by e-mailing song lyrics to Plaintiffs prior to the games. However, if, as the district court concluded, equal access to the lyrics of the dance routines is required, the auxiliary aid provided by Defendants must still be evaluated in terms of whether it results in "effective communication," and the district court's decision leaves open the question of whether prior e-mailing of the full lyrics of songs that may be played during the dance routines results in "effective communication."

course, even this conclusion does not mean that captioning is required for all stadiums, since other auxiliary aids could also be sufficient to result in effective communication. In addition, other stadiums may be able to raise defenses of undue burden or fundamental alteration, which were not raised by Defendants in this case. In this regard, I would note that the Department of Justice has undertaken the process of rulemaking to consider these various issues, but has concluded that "further consideration and review is prudent" given the complexity of the issues involved. Thus, the issues potentially raised in this case and the requirements of the ADA in this context would be matters of public importance and potential future rulemaking, but many of these issues were not fully litigated below or on appeal, given Defendants' decision to voluntarily provide auxiliary aids, including captioning on the LED boards and on the video screens in the concourse area. Indeed, this appeal came before us driven not by the substantive issues, but instead by Plaintiffs' claim for attorney's fees, as was candidly discussed during oral argument. Therefore, in my view, this case is not an appropriate forum or proceeding to determine these potential issues, and particularly to announce the broad rule set out in the district court's declaratory judgment.

37

Therefore, given all of the issues outlined above, I would reverse the declaratory judgment in this case, as it was entered by the district court, and I respectfully dissent from the majority opinion to the extent that it affirms that declaratory judgment.[4]

---

[4] However, as in the majority opinion, I would affirm the district court on Plaintiffs' cross-appeal with respect to the determination that issues related to the FM radio broadcast were not raised in the Complaint and therefore are not properly before the court. I therefore join that portion of the majority opinion related to the FM radio broadcast issue.