WILKINSON, Circuit Judge, dissenting:
 

 The majority's almost per se rule forces restaurants throughout the Fourth Circuit to give up control over their most valuable asset: the food they serve. This is a terrible rule. It forces restaurants to allow customers to bring in food prepared off the premises, in who knows what conditions, containing who knows what ingredients. It exposes the restaurants' patrons to public health risks, subjects the restaurants themselves to legal liability, and deprives servers of much needed tips. The accommodation requested in this case was not necessary because of the Tavern's offer of a gluten-free meal prepared in house, which is what the district court and magistrate judge so found. I would certainly uphold their judgment, and additionally I would hold that the requested modification was unreasonable. For these reasons, I respectfully dissent.
 

 I.
 

 The magistrate's report and recommendation, adopted in full by the district court, J.A. 423, describes the Americans with Disabilities Act's requirement on places of public accommodation. J.A. 332-34. As relevant here, those requirements come from clause 12182(b)(2)(A)(ii) of Title 42, which defines discrimination as
 

 a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;
 

 The Supreme Court explained that this clause contemplates "three inquiries[:]" whether the modification requested by the disabled individual is necessary, whether it is reasonable, and whether it would fundamentally alter the nature of the public accommodation.
 
 PGA Tour, Inc. v. Martin
 
 ,
 
 532 U.S. 661
 
 , 683 n. 38,
 
 121 S.Ct. 1879
 
 ,
 
 149 L.Ed.2d 904
 
 (2001). Accordingly, a public accommodation is not discriminating against a disabled individual by refusing to provide a modification that is not necessary or is not reasonable, which in my view is all that Colonial Williamsburg has done. While the majority claims its analysis is
 "individualized," Maj. Op. at 671-72, it is, as I shall demonstrate, tantamount to a ruling that restaurants must accept meals prepared outside their premises as a matter of course.
 

 II.
 

 I begin with necessity. Necessity is determined with respect to the disabled person's ability to obtain "full and equal enjoyment" of a public accommodation.
 
 42 U.S.C. § 12182
 
 (a). This court recognizes, of course, that it is not always possible for the experience of a disabled person to be "identical" to that of a person who does not suffer from a disability.
 
 Feldman v. Pro Football, Inc.
 
 ,
 
 419 F. App'x 381
 
 , 391-92 (4th Cir. 2011). Rather, the ADA simply requires that a disabled customer have an experience that is "as equal as possible[.]"
 

 Id.
 

 ;
 
 see also
 

 Baughman v. Walt Disney World Co.
 
 ,
 
 685 F.3d 1131
 
 , 1135 (9th Cir. 2012) ;
 
 Argenyi v. Creighton Univ.
 
 ,
 
 703 F.3d 441
 
 , 447-49 (8th Cir. 2013). As long as a disabled guest has "meaningful access" to a place of public accommodation, the ADA's requirements are satisfied.
 
 Argenyi
 
 ,
 
 703 F.3d at 448
 
 .
 

 The availability of a Tavern-prepared gluten-free meal allowed J.D. "meaningful access" to the restaurant's offerings and renders the modification sought by J.D. unnecessary. When J.D. arrived at the Tavern on his class trip, the head chef, Anthony Zurowski, offered to personally make and serve J.D. a gluten-free meal. Had J.D. accepted this offer, he would have been able to sit with his classmates inside the Tavern and enjoy its educational offering along side them. But, instead of accepting the offer, J.D. decided that he would eat a meal prepared at home. He was asked by the Tavern to do so at some nearby picnic tables. After finishing his home-prepared meal, J.D. rejoined his classmates in the Tavern for the remainder of their time there.
 

 I fully respect J.D.'s desire for a gluten-free meal. As appellant notes, Celiac Disease and Non-Celiac Gluten Sensitivity can, if not properly managed, result in severe health effects. Opening Br. for Appellant at 8-9. Of course J.D. should take all reasonable precautions to keep his condition in check, and of course his father is to be commended for wanting to do what he can to protect his son. J.D.'s dietary restriction makes great sense. If the Tavern, a well-known tourist destination that serves multitudes of patrons from around the world, were not offering J.D. a gluten-free meal we would have a different case.
 

 But that is not what happened here. In this case, J.D.'s own expert testified that the meal offered by Zurowski-baked chicken and potatoes-would be gluten-free. There is no dispute that Zurowski had extensive training as a chef, including one-on-one training from Colonial Williamsburg's head chef specifically focused on gluten-free meal preparation. J.A. 87-88. In light of that training, there is no dispute that Zurowski knew how to ensure that J.D.'s gluten-free meal was not contaminated by any trace amounts of gluten: he knew to use a separate designated area to prepare the meal, he knew to sanitize the area and his utensils beforehand, he knew to use a fresh set of gloves and apron, and he knew to use a separate oven. J.A. 337-39. Once it left the kitchen, there is no dispute that the Tavern's procedures required that J.D.'s meal be labeled as gluten-free and that it be specially covered with a metal lid to avoid cross contamination. J.A. 339. And there is no dispute that the Tavern had extensive experience preparing gluten-free meals for patrons with disabilities that were similar to J.D.'s: Over the past five years, Zurowski had prepared roughly four to five gluten-free meals a day, for a total of over
 5,000 meals, without ever receiving a single complaint that the meals actually contained gluten. J.A. 339. J.D.'s father even admitted he had no reason not to trust the Tavern's kitchen staff. J.A. 341.
 

 J.D. does allege two unfortunate experiences at other restaurants assertedly offering gluten-free meals. But the reasons for those restaurants' purported failures are but hastily and sketchily described in the record, while a wealth of undisputed information attests to the rigor and adequacy of the Tavern's preparations. Given the unchallenged facts, the district court was absolutely correct to grant appellee's summary judgment motion. Had J.D. accepted the Tavern's bona fide offer of a gluten-free meal, his experience would have been almost identical to that of his classmates. Any difference in his experience was caused by his rejection of that offer and his desire to replace the Tavern's accommodation with his own. But the ADA does not require places of public accommodation to provide the precise modification requested by the disabled individual.
 
 Callum v. CVS Health Corporation
 
 ,
 
 137 F.Supp.3d 817
 
 , 840 (D.S.C. 2015) (citing
 
 McElwee v. Cnty of Orange
 
 ,
 
 700 F.3d 635
 
 , 641 (2d Cir. 2012) ). Rather, the ADA allows places of public accommodation like Shields Tavern the freedom to decide how best to provide "meaningful access" to patrons with disabilities. The undisputed facts in the record demonstrate convincingly that the Tavern's offer to J.D. meets this standard; J.D.'s requested modification was not necessary.
 

 III.
 

 In addition to being unnecessary, J.D.'s requested modification was not required by the ADA because it was unreasonable.
 
 See
 

 PGA Tour
 
 ,
 
 532 U.S. at 683, n.38
 
 ,
 
 121 S.Ct. 1879
 
 . As the majority concedes, "[f]acilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons[;]" they "need only make accommodations that are reasonable." Maj. Op. at 674 (quoting
 
 Baughman v. Walt Disney World Co.,
 

 685 F.3d 1131
 
 , 1135 (9th Cir. 2012) ). Reasonableness, in turn, is evaluated with respect to the "disruption of [the restaurant's] business" and the threat to "safety" occasioned by the modification.
 
 Baughman
 
 ,
 
 685 F.3d at 1135
 
 .
 

 A policy that allows patrons to consume home-prepared meals inside the Tavern with no advance notice would effect a significant disruption in the Tavern's business. Shields Tavern, unlike most of Colonial Williamsburg, is primarily "in the business of selling food." Br. for Appellee at 30. It is further in the business of providing "the atmosphere of an eighteen-century colonial tavern[,]" with an eye toward educating patrons about our shared past. J.A. 342. We need not decide between these two characterizations of the Tavern's business, because they are easily reconcilable: The Tavern's menu-like its interior design, the costume of its servers, and the presence of reenactors-works to create the overall impression of being transported back in time. J.A. 59-60.
 

 Allowing patrons to ignore the restaurant's menu would disrupt this business. It would let people bring in their own meals, occupy the Tavern's tables, engage the time and attention of the Tavern's servers, and otherwise divert the Tavern's resources from paying customers, all without ever purchasing food from the Tavern itself. The disruption is plain. Such a policy would deny the restaurant much-needed revenue-the restaurant business is notoriously a low-margin one. It would also deny the servers the gratuities they rely on to make ends meet, as tips are usually calculated with respect to the cost of the food ordered from the restaurant. These
 disruptions are in no way mandated by the ADA.
 

 The proposed modification would also disrupt the carefully cultivated eighteenth-century atmosphere of the Tavern. The dishes served at the Tavern, while "modern[,]" Br. for Appellee at 30, are consistent with the "atmosphere" identified by the magistrate judge. J.A. 342. The aroma and appearance of turkey or chicken would not be too alien to Williamsburg's early inhabitants. But allowing patrons to consume home-prepared meals would open the gates to all manner of cuisines, without any respect for the Tavern's historical theme. People could bring in food that is utterly inconsistent with the atmosphere provided by the Tavern. The smell of such food, or even its appearance, would spoil and undercut the experience for paying customers.
 

 But that is not all. In addition to the disruptions to the Tavern's business, the proposed modification is also unreasonable because it poses safety hazards to the Tavern's other customers. The presence of outside food in the restaurant presents a risk of provoking food allergies or sensitivities in other patrons. The Commonwealth of Virginia may have had this concern in mind when it enacted the provision of its health code that prohibits "[f]ood prepared in a private home" from being "used or offered" by a restaurant. 12 Va. Admin. Code 5-421-270(B). Whether or not it actually prohibits customers from consuming their own home-prepared meal in a public restaurant, the provision demonstrates that the Commonwealth knows well the risks of food prepared in private, uninspected kitchens. Another section of Virginia's health code would make the Tavern legally responsible should the outside food contaminate the food prepared in the restaurant.
 
 See
 
 12 Va. Admin. Code 5-421-690. These provisions do not trump the ADA, but they certainly bear on the reasonableness of the proposed modification.
 

 These safety concerns are particularly pressing in light of the erosion of public health systems more generally. Public health and sanitation may not rank among humanity's most glamorous and heralded medical achievements, but they have contributed immeasurably to the quality of life we enjoy. They cannot, however, be taken for granted: Contagions as diverse as Ebola and measles might suggest the need for sanitary vigilance even to the unwary.
 
 See, e.g.
 
 "Measles,"
 
 Epidemiology and Prevention of Vaccine-Preventable Diseases
 
 , Centers for Disease Control and Prevention (13th ed. 2015). Public health departments and restaurants cannot afford the luxury of carelessness where, as here, they deal in such basics as the safety of food and water.
 

 Finally, the proposed modification is unreasonable because it imposes a vague and unmanageable standard on restaurants everywhere. The majority's rule means that a patron's demand that he be allowed to eat outside food will sometimes be reasonable and other times not. This puts managers in the middle of a difficult line-drawing exercise: What criteria are they supposed to use in navigating the tension between the ADA's requirements and public health law? Which privately prepared meals must they allow and which may they refuse? The majority wouldn't even require advance notice from customers in J.D.'s position, meaning that managers will have to evaluate the disruption and the safety hazard of a customer's outside meal on the fly, with the specter of litigation hanging overhead.
 

 IV.
 

 The majority holds that forcing restaurants to give up control over the food they serve is a perfectly reasonable thing to do.
 

 While the majority claims its analysis is "individualized," Maj. Op. at 671-72, the real-world consequences of its ruling are sweeping in effect. Even restaurants which, like the Tavern, have made indisputably rigorous and wholly commendable efforts to prepare gluten-free meals and thereby accommodate people with J.D.'s disability are strung up. Only in the judicial monastery could this impractical and unworkable requirement hatch. While the holding here is not the end of the matter-Colonial Williamsburg may well prevail at trial-it has the flavor of a de facto per se rule: Restaurants must either allow patrons to consume food prepared outside their premises or must justify their refusal at a costly trial. In practice, I suspect many will forgo the litigation and simply fold the tent. Thus do we bid a rule whose health and safety benefits are self-evident farewell.