174

[No. 67613-0-I. Division One. January 28, 2013.]

THE WASHINGTON STATE COMMUNICATION ACCESS PROJECT, *Respondent*, v. REGAL CINEMAS, INC., ET AL., *Appellants*.

176

178

180

*Thomas A. Lemly* and *Roger A. Leishman* (of *Davis Wright Tremaine LLP*) (*Laura M. Franze* and *M. Brett Burns* of *Hunton & Williams LP*, of counsel), for appellants.

*John F. Waldo*, for respondent.

¶1 Cox, J. — Regal Cinemas Inc., Cinemark Holdings Inc., and American Multi-Cinema Inc. (AMC) appeal decisions of the trial court in this action under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. They contend that the Washington State Communication Access Project (WashCAP), a nonprofit corporation and the successful plaintiff, is not entitled to the declaratory, injunctive, and attorney fee relief awarded below. We disagree and affirm.[1]

¶2 WashCAP has the stated purpose "to enable those with hearing losses to enjoy public places and participate in

---

[1] We withdraw our prior opinion, filed on December 10, 2012, and substitute this opinion.

public life as fully as those without hearing losses to the extent such full participation is technologically and economically possible."[2] Its members have hearing losses of such magnitude that they are unable to understand some or all spoken movie content when they attend theaters owned and operated by Regal, Cinemark, and AMC. The members cannot understand aural movie content even with the use of an assistive listening device. However, they can understand movie captions that display spoken content and other aural information in visual text form. Captions may be displayed in either closed or open format. In closed captioning, captions are displayed only to those individuals who request display devices. In open captioning, the captions are displayed to the entire audience.

¶3 Regal, Cinemark, and AMC own and/or operate movie theaters in King County. They are all engaged in the business of exhibiting movies. Movie producers furnish most movies to the theater companies with embedded captions for both open and closed captioning. Theaters must then invest in technology to make those captions viewable to those who attend screenings.

¶4 In February 2009, WashCAP commenced this action.[3] It asserted claims under chapter 49.60 RCW, the WLAD, claiming that the theaters were violating the statutory requirement that places of public accommodation provide reasonable accommodation for those with disabilities. WashCAP specifically argued that the theaters should provide captioning in the screening of those movies previously embedded with captions to accommodate the disability of those patrons who are deaf or hard-of-hearing. WashCAP sought declaratory and injunctive relief, reasonable attorney fees, and court costs.

---

[2] Clerk's Papers at 1519.

[3] WashCAP later dismissed three of the six original defendants: Silver Cinemas Acquisition Co. LLP, Lincoln Square Cinemas LLC, and Kirkland Parkplace Cinemas LLC.

¶5 Both WashCAP and the theaters moved for summary judgment. The trial court granted partial summary judgment for WashCAP and denied the theaters' motion for summary judgment in May 2010. The court concluded that the WLAD required movie theaters, as places of public accommodation, to take those steps reasonably possible under the circumstances to make movie soundtracks understandable to patrons with hearing loss. The court then limited the trial issues to "the question of what is a 'reasonable accommodation' for each Defendant."[4]

¶6 After the court's entry of partial summary judgment, Regal and Cinemark both converted all of their King County theaters from film to digital projection.[5] For open captions to be displayed, in contrast to film projection, digital projection requires no special technology.[6] Three technologies exist to display closed captions with digital projection.[7]

¶7 By February 2011, Regal and Cinemark equipped all of their theaters with equipment to display closed captions for all showings of all movies embedded with captions. Because of this conversion, Cinemark moved to dismiss WashCAP's request for declaratory relief. The trial court denied this motion.

¶8 In contrast to Regal and Cinemark, AMC had still not fully converted all of its King County theaters to digital projection by January 2011. At that time, it had equipped only three auditoriums in King County to show closed caption films, using older technology.

¶9 The parties agreed to proceed to trial on written submissions.[8] Following receipt of these submissions, the trial court heard oral arguments in May 2011.

---

[4] Clerk's Papers at 638.

[5] *Id.* at 1522.

[6] *Id.* at 1520.

[7] *Id.* at 1521.

[8] *Id.* at 1517.

¶10 Because of the increase in closed captioned screenings by Regal and Cinemark, WashCAP agreed that its injunctive relief claims as to these defendants were moot. But WashCAP still sought declaratory relief against them. Because AMC had not equipped all of its theaters with closed captioning technology, WashCAP sought both injunctive and declaratory relief against it.

¶11 Cinemark, joined by Regal, renewed its motion to dismiss WashCAP's claims as moot. All defendants also renewed arguments they had made previously in their summary judgment motions. These were that (1) the imposition of a captioning requirement must come from an agency rather than a court of law, (2) a captioning mandate fashioned by a court of law would be a deprivation of their due process rights, (3) the declaratory relief WashCAP requested was not authorized by the declaratory judgment act, and (4) WashCAP was not entitled to attorney fees. The theaters also raised three new arguments: (1) the WLAD does not authorize declaratory relief, (2) "numerical standards are more appropriately determined by agency rulemaking," and (3) the claim for injunctive relief against AMC was not ripe.[9]

¶12 In July 2011, the trial court entered findings of fact, conclusions of law, and a final order. The court dismissed WashCAP's claims for injunctive relief against Regal and Cinemark but granted it declaratory relief against all three theaters. It also granted injunctive relief against AMC.

¶13 Given AMC's overall net cash flow and the cost to equip all of its King County auditoriums with closed captioning technology, the court held that it was reasonable for AMC to undertake the same conversion that Regal and Cinemark had completed. It ordered AMC to do so within 90 days.

¶14 Finally, the court concluded that WashCAP was the prevailing party, entitled to reasonable attorney fees under

---

[9] *Id.* at 1518.

the WLAD. In a separate order, the court awarded WashCAP attorney fees based on a lodestar amount adjusted by a contingency multiplier of 1.5. The award totaled $404,322.76.

¶15 Regal, Cinemark, and AMC appeal.

## DISCRIMINATION

¶16 The theaters argue that the trial court incorrectly interpreted the WLAD. They claim the WLAD does not regulate the accessibility of goods and services provided by places of public accommodation, as opposed to the accessibility of places of public accommodation themselves.[10] We hold that the WLAD is not so limited.

¶17 Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[11] This court reviews de novo a trial court's summary judgment order.[12]

¶18 Here, the trial court granted partial summary judgment to WashCAP, concluding that as a matter of law, defendant movie theaters are required to take steps reasonably possible to make the soundtracks of movies already embedded with closed captioning understandable to people with hearing loss. No party claims there were any genuine issues of material fact. Thus, the question is limited to whether the law supports the trial court's ruling.

### Comparable Services

¶19 The WLAD bans discrimination because of "the presence of any *sensory*, mental, or physical disability . . . ."[13] This right to be free from discrimination includes the right "to

---

[10] Brief of Appellants at 18.

[11] *Stokes v. Polley*, 145 Wn.2d 341, 346, 37 P.3d 1211 (2001); CR 56.

[12] *Fell v. Spokane Transit Auth.*, 128 Wn.2d 618, 625, 911 P.2d 1319 (1996).

[13] RCW 49.60.030(1) (emphasis added).

the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement."[14]

¶20 To make a prima facie case of public accommodation discrimination under the WLAD, a plaintiff must demonstrate (1) that he has a disability, (2) that the defendant's place of business is a public accommodation, (3) that the defendant discriminated against the plaintiff by providing treatment not comparable to the level of services provided to individuals without disabilities, and (4) that the disability was a substantial factor causing the discrimination.[15] The defendants do not dispute that their theaters are places of public accommodation, that WashCAP's members have a disability, or that this disability was a substantial factor in causing differential treatment. Rather, they contend that the treatment they provided WashCAP's members was not discriminatory, and that WashCAP thus did not satisfy the third element of a prima facie WLAD case.

¶21 Under the regulations created to carry out the policy enunciated in RCW 49.60.030, "same service" treatment of persons with disabilities is preferred. But "reasonable accommodation" may be required:

(1) **Same service preferred.** The purposes of the law against discrimination are best achieved when disabled persons are treated the same as if they were not disabled. . . .

(2) **Reasonable accommodation.** The law protects against discrimination because of the "presence" of a disability. It does not prohibit treating disabled persons more favorably than nondisabled persons in circumstances *where the same service will defeat the purposes of the law against discrimination.*[16]

---

[14] RCW 49.60.030(1)(b).

[15] *Negron v. Snoqualmie Valley Hosp.*, 86 Wn. App. 579, 581, 936 P.2d 55 (1997) (citing *Fell,* 128 Wn.2d at 637).

[16] WAC 162-26-060 (emphasis added).

The Washington Administrative Code (WAC) goes on to reiterate that the overall objective of the WLAD is that people with disabilities be "afforded the full enjoyment of places of public accommodation to the greatest extent practical."[17]

¶22 The state cases that have interpreted the accommodation necessary under the WLAD have focused on the comparability of the accommodation with the service provided to the nondisabled. This analysis arises from the supreme court's holding in *Fell v. Spokane Transit Authority*, where the supreme court held that the disabled need only be provided with comparable services.[18] In *Fell*, a class of disabled riders sued the Spokane Transit Authority. They argued that the Spokane Transit Authority plan violated the WLAD because it made no provision for disabled individuals residing outside of fixed bus routes.[19] The court held that the trial court erred when it granted summary judgment to the disabled bus riders.[20] It explained that "there is discrimination only when the disabled are not provided with comparable services."[21]

¶23 In *Negron v. Snoqualmie Valley Hospital*,[22] this court interpreted *Fell*. There, Overlake Hospital did not consistently provide an interpreter to communicate with Negron, who is deaf, about her care.[23] We affirmed the trial court's denial of summary judgment for the hospital, making clear that " '[c]omparable' does not mean identical."[24]

---

[17] WAC 162-26-060(3).

[18] 128 Wn.2d 618, 635-36, 911 P.2d 1319 (1996).

[19] *Id.* at 623-24.

[20] *Id.* at 635-36.

[21] *Id.* at 635.

[22] 86 Wn. App. 579, 936 P.2d 55 (1997).

[23] *Id.* at 582-83.

[24] *Id.* at 585.

Using the "comparability" analysis enunciated in *Fell*, this court stated:

> [P]laces of public accommodation may be required to reasonably accommodate disabled patrons in order to provide them with treatment comparable to the treatment received by nondisabled persons.
>
> Treatment received in a hospital generally includes not only medical intervention, but also the opportunity to explain symptoms, ask questions, and understand the treatment being performed including options, if any. *A reasonable accommodation to a deaf patient is one that allows a comparable opportunity, reasonable under the circumstances.*[25]

Thus, the question for places of public accommodation is not whether the steps they are required to take for their disabled patrons are different from those taken for the nondisabled. Instead, as *Negron* made clear, it is whether those steps create a comparable opportunity, reasonable under the circumstances, between the disabled and others. A place of public accommodation is not required to provide extra services to persons with disabilities, but it may not deny full access to services already provided.

¶24 Here, as we noted, there is no dispute that the theaters are places of public accommodation. Likewise, there is no dispute that those who are hard of hearing are disabled and that this disability is a substantial factor causing the alleged discrimination. Thus, the remaining question is whether those hard-of-hearing are discriminated against by movie screening services that are not comparable to the service provided to those without disabilities.[26]

¶25 No Washington court has decided whether movie theaters must provide aural accommodation for their hard-of-hearing patrons. But various federal courts have.

---

[25] *Id.* at 585-86 (emphasis added).

[26] *Fell*, 128 Wn.2d at 637.

■ ¶26 Washington courts may look to Title III of the Americans with Disabilities Act (ADA)[27] and interpretation of that provision as one source of guidance in adjudicating WLAD cases.[28] That source of law is helpful, though it is not necessarily dispositive.[29]

¶27 Four federal cases have specifically addressed the question of captions in movie theaters: *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*;[30] *Ball v. AMC Entertainment, Inc.*;[31] *Cornilles v. Regal Cinemas, Inc.*;[32] and *Todd v. American Multi-Cinema, Inc.*[33] These cases have either relied on or distinguished two other public accommodation cases: *John Doe v. Mutual of Omaha Insurance Co.*[34] and *Weyer v. Twentieth Century Fox Film Corp.*[35]

¶28 In the most recent case, the Ninth Circuit in *Harkins* held that movie theaters may be required to provide closed captioning services under the ADA.[36] There, the district court granted Harkins' motion to dismiss based

---

[27] 42 U.S.C. §§ 12181-12189.

[28] *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 180, 23 P.3d 440 (2001), *abrogated on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006).

[29] *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 361-62, 753 P.2d 517 (1988) (noting that in the employment discrimination context, federal law represents a source of guidance, but that Washington courts "are free to adopt those theories and rationale which best further the purposes and mandates of our state statute").

[30] 603 F.3d 666 (9th Cir. 2010).

[31] 246 F. Supp. 2d 17 (D.D.C. 2003).

[32] 2002 WL 31440885, 2002 U.S. Dist. LEXIS 7025 (D. Or. Jan. 3, 2002) (Amended Findings and Recommendation).

[33] 2004 WL 1764686, 2003 U.S. Dist. LEXIS 25317 (S.D. Tex. Aug. 5, 2003) (Memorandum and Order). Under GR 14.1(b) and Fed. R. App. P. 32.1, parties and Washington courts may cite to federal unpublished opinions filed on January 1, 2007 or later. Thus, the parties and this court may reference and cite to *Cornilles* and *Todd* and other unpublished cases.

[34] 179 F.3d 557 (7th Cir. 1999).

[35] 198 F.3d 1104 (9th Cir. 2000).

[36] *Harkins*, 603 F.3d at 668.

on its argument that the ADA did "not require movie theaters to alter the content of their services."[37] The court disagreed, pointing to the ADA's requirement for " 'auxiliary aids and services.' "[38] Under 42 U.S.C. §12182(a), "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." Subsection (a)(2)(A) provides that "discrimination includes . . . (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently . . . because of the absence of *auxiliary aids and services.* . . ."[39] The court concluded that captions "clearly are auxiliary aids and services" and consequently may be required under the ADA.[40]

¶29 The *Harkins* court distinguished its prior decision in *Weyer*. In *Weyer*, the court addressed "an insured's challenge to her long-term disability insurance policy's limit on mental illness benefits that did not similarly limit non-mental illness benefits."[41] The court held that this policy was not discriminatory, concluding that the language of Title III "does not require [the] provision of different goods or services [to those with disabilities], just nondiscriminatory enjoyment of those that are provided."[42] Though Harkins attempted to analogize his arguments to that of the insurers in *Weyer*, the Ninth Circuit rejected this comparison.[43] The court stated:

---

[37] *Id.*

[38] *Id.* at 671 (emphasis omitted) (quoting 42 U.S.C. § 12182(b)(2)(A)(iii)).

[39] 42 U.S.C. § 12182(a)(2)(A) (emphasis added).

[40] *Harkins*, 603 F.3d at 670.

[41] *Id.* at 671.

[42] *Weyer*, 198 F.3d at 1115.

[43] *Harkins*, 603 F.3d at 671-72.

In arguing that the ADA's requirement of auxiliary aids and services is limited by *Weyer*, Harkins puts the cart before the horse: *Weyer* does not limit subsection 42 U.S.C. § 12182(b)(2)(A)(iii)'s requirement that a public accommodation provide auxiliary aids and services; the requirement that establishments provide auxiliary aids and services limits *Weyer*'s general rule that public accommodations do not have to provide different services for the disabled.[44]

It went on to note that the district court's reasoning, which relied on *Weyer*, "effectively eliminates the duty of a public accommodation to provide auxiliary aids and services."[45] The court explained:

By its very definition, an auxiliary aid or service is an ***additional*** and different service that establishments must offer the disabled. For example, a courthouse that was accessible only by steps could not avoid ADA liability by arguing that everyone— including the wheelchair bound—has equal access to the steps. And an office building could not avoid having to put Braille numbering on the buttons in its elevator by arguing that everyone—including the blind—has equal access to the written text.[46]

¶30 Like *Weyer*, in *Doe*, the Seventh Circuit addressed the requirements for insurance companies to make accommodations under Title III.[47] There, the court held that it was not a violation of the ADA for insurance companies to cap the benefits they offered.[48]

¶31 In dicta, the *Doe* court stated, "It is hardly a feasible judicial function to decide whether shoestores should sell single shoes to one-legged persons and if so at what price, or how many Braille books the Borders or Barnes and Noble

---

[44] *Id.*

[45] *Id.* at 672.

[46] *Id.* (emphasis added).

[47] *Doe*, 179 F.3d 557.

[48] *Id.* at 561.

bookstore chains should stock . . . ."[49] It went on to note that "the Braille case, and many others that we can imagine ([for instance] a movie theater's refusal to provide a running translation into sign language of the movie's soundtrack), [is a case] of refusing to configure a service to make it as valuable to a disabled as to a nondisabled customer."[50] But the *Doe* court made these statements nine years before *Harkins* was decided. And, over the course of the nine years, the technology and possible options for closed captioned screening available to theaters has changed dramatically, no longer necessitating "a running translation into sign language."[51]

¶32 Similarly, in 2002 and 2003, prior to recent technological developments in closed captioning, two magistrate judges held that while Title III of the ADA requires plaintiffs to have access to movie theaters, it does not require that the theaters take steps to make these films understandable to them.[52] In so holding, the *Cornilles* magistrate characterized the supply of captioned movies as "limited."[53] The magistrate in that case went on to note, "Because of the small number of open-captioned copies available to the theaters, the theaters have little, if any, control over the times and days that they may show the open-captioned films."[54] Similarly, the *Todd* magistrate noted that at the time, there was only one technology available for displaying closed captioning in theaters.[55]

¶33 In contrast to *Todd* and *Cornilles*, the District of Columbia District Court in *Ball* held that closed captions

---

[49] *Id.* at 560.

[50] *Id.*

[51] *Id.*

[52] *Todd*, 2004 WL 1764686, at *4, 2003 U.S. Dist. LEXIS 25317, at *13-16; *Cornilles*, 2002 WL 31440885, at *2, 2002 U.S. Dist. LEXIS 7025, at *5-18.

[53] *Cornilles*, 2002 WL 31440885, at *6, 2002 U.S. Dist. LEXIS 7025, at *8.

[54] *Cornilles*, 2002 WL 31440885, at *6, 2002 U.S. Dist. LEXIS 7025, at *17.

[55] *Todd*, 2004 WL 1764686, at *2 n.6, 2003 U.S. Dist. LEXIS 25317, at *6 n.6.

could be required under the ADA as a reasonable accommodation.[56] The *Ball* court pointed out that captions were already provided to the movie theaters by the movie companies.[57] Thus, showing them did not require the movie theaters, themselves, to alter the goods they offered:

> Defendants fail to recognize that they are not similarly-situated to bookstores and video stores that provide goods because Defendants provide the *service* of screening first run movies. . . . Given that . . . closed captions . . . can be provided to deaf individuals during normal screening of those films, [closed caption technology] can be required under the ADA because it would not change the nature of the service supplied by Defendants—screening first run movies to the public.[58]

¶34 Here, we agree with the *Ball* and *Harkins* courts. The "auxiliary aid" provision of the ADA upon which the *Harkins* court relied is the functional equivalent of the WLAD requirement to make the regular service of public accommodations accessible to the disabled. Specifically, the WLAD states:

> "Reasonable accommodation" means action, *reasonably possible in the circumstances*, to make the *regular service of a place of public accommodation accessible to persons who otherwise could not use or fully enjoy the services because of the person's sensory*, mental, or physical *disability*.[59]

¶35 "Accessible" is defined as "usable or understandable by a person with a disability."[60] Understandability is not defined by the WAC. To determine the meaning of an

---

[56] *Ball*, 246 F. Supp. 2d at 24.

[57] *Id.*

[58] *Id.* at 24-25.

[59] WAC 162-26-040(2) (emphasis added).

[60] *Id.*

undefined term, courts may look to the dictionary.[61] To "understand" means "[t]o comprehend the language, sounds, form, or symbols of."[62] And to make something comprehensible for a person with a disability may require that "auxiliary aids" be used.

¶36 Under the circumstances of this case, as in *Harkins*, the theaters must take action that is reasonably possible to make their screenings, for which captions are provided by film distributors, understandable to deaf and hard-of-hearing patrons. The WLAD requires this.

¶37 The theaters attempt to dismiss the *Harkins* case in a footnote, arguing that the WLAD does not have a similar "auxiliary aid" provision. But, as we explain above, the WLAD definition of accessibility requires a similar type of accommodation.

¶38 The theaters also contend that the trial court's ruling incorrectly interpreted the WLAD by regulating accessibility of **goods and services** as opposed to regulating accessibility **to** the places of public accommodation themselves. But, as explained above, the WLAD and its regulations require that places of public accommodation are made usable **or** understandable to those who are disabled.[63] And, as *Ball* noted, movie theaters provide the service of **screening movies**.[64] Thus, under the WLAD, they must make this **service** understandable to those who are disabled.

*Excess Service*

¶39 The theaters next argue that requiring them to provide closed captions is contrary to the supreme court's ruling in *Fell*, as it requires provision of an excess service

---

[61] *In re Det. of Danforth*, 173 Wn.2d 59, 67, 264 P.3d 783 (2011).

[62] AMERICAN HERITAGE DICTIONARY 1948 (3d ed. 1992).

[63] WAC 162-26-040(2).

[64] *Ball*, 246 F. Supp. 2d at 24.

that would not normally be provided. They distinguish *Negron*, arguing that it involved an "access barrier." But, this argument, again, assumes that the service that movie theaters provide is selling tickets to movies, rather than screening them for their customers. This is not the case. *Negron* made clear that reasonable accommodation is required if the same service does not provide equal access. Thus, the service here is not "excess service."

## DUE PROCESS AND FAIR NOTICE

¶40 The theaters argue that the trial court interpreted "vague standards" of the WLAD and its regulations to require captioning and then subjected them to liabilities arising from the requirement, violating their due process rights.[65] We disagree.

■ ¶41 "Due process requires that the government provide citizens and other actors with sufficient notice as to what behavior complies with the law."[66] "An ordinance or statute is 'void for vagueness if it is framed in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.' "[67] As our supreme court stated, "The purpose of the vagueness doctrine is to ensure that citizens receive fair notice as to what conduct is proscribed, and to prevent the law from being arbitrarily enforced."[68]

■ ¶42 The test in Washington for vagueness is the "common intelligence" test.[69] This test does not require a

---

[65] Brief of Appellants at 26.

[66] *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008).

[67] *City of Seattle v. Eze*, 111 Wn.2d 22, 26, 759 P.2d 366 (1988) (quoting *O'Day v. King County*, 109 Wn.2d 796, 810, 749 P.2d 142 (1988)).

[68] *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 739-40, 818 P.2d 1062 (1991) (citing *Eze*, 111 Wn.2d at 26).

[69] *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 273, 501 P.2d 290 (1972).

statute to meet impossible standards of specificity.[70] Thus, "a statute is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct."[71] "If, based on common practice and understanding and in the context of well-defined usage, a statute provides fair notice of what it requires, then it will not be subject to a procedural due process challenge on grounds of vagueness."[72]

¶43 There are no cases in Washington in which our courts have addressed a void for vagueness challenge to the WLAD based on the reasonable accommodation provisions. But, the supreme court has previously rejected a challenge to WLAD's provision that it is an unfair practice for any employer "[t]o refuse to hire any person because of such person's . . . handicap . . . ."[73]

¶44 In *Chicago, Milwaukee, St. Paul & Pacific Railroad v. Washington State Human Rights Commission*,[74] a disabled applicant claimed that the railroad had discriminated against him based on his physical handicap.[75] The lower court "declared RCW 49.60 'void for lack of a definition of the term "handicapped." ' "[76] The supreme court disagreed, explaining that the statute provided fair notice of what was required of an employer.[77] "Men of common intelligence need not guess at the meaning of 'handicap' because it has

---

[70] *Blondheim v. State*, 84 Wn.2d 874, 878, 529 P.2d 1096 (1975).

[71] *Eze*, 111 Wn.2d at 27.

[72] *Chi., Milwaukee, St. Paul & Pac. R.R. v. Wash. State Human Rights Comm'n*, 87 Wn.2d 802, 805, 557 P.2d 307 (1976) (citing *Sonitrol Nw., Inc. v. City of Seattle*, 84 Wn.2d 588, 594, 528 P.2d 474 (1974); *Blondheim*, 84 Wn.2d at 878).

[73] *Id.* at 804-05 (third alteration in original) (quoting RCW 49.60.180(1)).

[74] 87 Wn.2d 802, 557 P.2d 307 (1976).

[75] *Id.* at 803.

[76] *Id.* at 804.

[77] *Id.* at 805.

a well defined usage measured by common practice and understanding. 'Handicap' commonly connotes a condition that prevents normal functioning in some way."[78] Thus, the court held that the WLAD requirements were not vague.

¶45 Here, the WLAD provided reasonable specificity that was clear enough to provide fair notice to the theaters of their legal requirements. Neither the legislature nor the Human Rights Commission, which was tasked with interpreting the WLAD and promulgating administrative codes to enforce its provisions, could detail every step that every place of public accommodation must make for persons with disabilities. But, as in *Chicago*, the WLAD and the WAC regulation's promulgated by the Human Rights Commission provided movie theaters with guidance for what proper services for disabled patrons should be.

¶46 As stated above, WAC 162-26-060 provides that the WLAD "does not prohibit treating disabled persons more favorably than nondisabled persons in circumstances where same service will defeat the purposes of the law against discrimination." And, as defined in WAC 162-26-040(2), "reasonable accommodation" means "action, reasonably possible in the circumstances, to make the regular services of a place of public accommodation accessible to [disabled] persons." Accessibility, in turn, is defined as making a service usable or understandable.[79] It is true that these provisions do not detail whether movie theaters have to provide captions under the WLAD. But such specifics are not required. The WLAD and the WAC regulations provided the movie theaters with fair notice that they had to undertake reasonable accommodations, which meant making their services usable or understandable to their disabled patrons.

¶47 Further, the court's final order demonstrates its clear interpretation of the WLAD's accessibility requirement. It ordered AMC, the only theater which had not

---

[78] *Id.*

[79] WAC 162-26-040(2).

adopted closed captioning in its auditoriums, to adopt some "effective method for making soundtracks understandable" to the deaf community. While the court recommended closed captioning, it also allowed the theater to adopt an "equally effective method" if it so chose. Thus, the holding of the trial court tracked the WLAD, whose own language is as specific and clear as is necessary to comply with due process.

¶48 The theaters point to one sentence from a short phrase in the supreme court's *Fell* decision to support their argument. In *Fell*, the court noted, "In contrast to Washington's *vague standards*, the federal standards for treatment of the disabled are specific."[80] But, nowhere in that case did the court hold or conclude that the WLAD was so vague as to be a violation of due process. And, it looked to the ADA for interpretive help.[81] Doing so here, as the *Harkins* court held, supports the conclusion that movie theaters must reasonably provide captioning.

¶49 The theaters argue that the Ninth Circuit's holding in *United States v. AMC Entertainment, Inc.*[82] supports their argument. It does not.

¶50 There, the Ninth Circuit examined ADA compliance in the context of new "stadium seating" technology used in movie theaters.[83] The Department of Justice brought suit against AMC, "alleging that the theaters violated Title III of the ADA . . . by placing wheelchair seating in the front rows of their new stadium complexes."[84] Section 4.33.3 of the ADA regulations required that " '[w]heelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and *lines of sight comparable to those for*

---

[80] *Fell*, 128 Wn.2d at 628 (emphasis added).

[81] *Id.*

[82] 549 F.3d 760 (9th Cir. 2008).

[83] *Id.* at 762.

[84] *Id.*

*members of the general public.' "*[85] The department argued that the new wheelchair areas in stadium seating theaters did not provide comparable lines of sight.[86] But, the court noted that "[w]hile 'lines of sight' was a phrase long familiar to parties involved in the movie theater industry, its precise meaning shifted depending upon the particular context. . . ."[87]

> The circuits are split as to whether § 4.33.3 mandates comparable viewing angles, an unobstructed view, or merely dispersed seating options. . . . Amid this morass of litigation, we decline to hold that a person of ordinary intelligence should have known . . . that § 4.33.3 was susceptible only to the [government's current] interpretation.[88]

¶51 Thus, the court held that the theaters were not given fair notice. But here, there was no such changing interpretation of what the WLAD required. The plain language requiring reasonable accommodation does not violate due process.

## PRIMARY JURISDICTION

¶52 The theaters contend that once they adopted technologies that allowed closed captioning in their movie theaters, it was error for the lower court to proceed with the case rather than deferring to an administrative body. We disagree.

¶53 The question of whether an administrative body has jurisdiction over the questions presented here is one that this court reviews de novo.[89]

---

[85] *Id.* at 763-64 (quoting 28 C.F.R. pt. 36, app. D § 4.33.3).

[86] *Id.* at 762.

[87] *Id.* at 764.

[88] *Id.* at 768-69 (quoting *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000)).

[89] *Ingram v. Dep't of Licensing*, 162 Wn.2d 514, 521, 173 P.3d 259 (2007).

 ¶54 Washington's superior courts have jurisdiction to hear a case because of either a constitutional or a statutory provision.[90] The WLAD states that "[a]ny person deeming himself or herself [to be] injured by any act in violation of this chapter shall have a civil [right of] action in a court of competent jurisdiction. . . ."[91] The theaters are unable to point to any section of the WLAD that mandates that questions of discrimination must first be delegated to any administrative agency.

 ¶55 Under the primary jurisdiction doctrine, a court should refrain from exercising its jurisdiction on a particularly technical issue that emerges in the court's proceeding if an agency has special competence concerning that issue.[92] The court should then defer its jurisdiction to the administrative agency.[93] The application of this doctrine is not mandatory, but rather is within the sound discretion of the court.[94] We hold that the court did not abuse its discretion by deciding the issues presented to it rather than deferring to an agency.

¶56 RCW 49.60.050 of the WLAD created the Human Rights Commission. Under RCW 49.60.120(3), the commission has the "functions, powers, and duties: . . . [t]o adopt, amend, and rescind suitable rules to carry out the provisions of this chapter." The Human Rights Commission, like other agencies in the state, follows the Administrative Procedure Act's (APA) rules regarding promulgation of new rules.[95] An individual may report discrimination to the

---

[90] *Dougherty v. Dep't of Labor & Indus.*, 150 Wn.2d 310, 319, 76 P.3d 1183 (2003).

[91] RCW 49.60.030(2).

[92] *Schmidt v. Old Union Stockyards Co.*, 58 Wn.2d 478, 484, 364 P.2d 23 (1961) (quoting *United States v. W. Pac. R.R.*, 352 U.S. 59, 63-64, 77 S. Ct. 161, 1 L. Ed. 2d 126 (1956)).

[93] *Id.*

[94] *Kerr v. Dep't of Game*, 14 Wn. App. 427, 429, 542 P.2d 467 (1975).

[95] WAC 162-08-600; RCW 34.05.320.

Human Rights Commission.[96] And, an individual may initiate the creation of a new rule under the WLAD.[97] But, there is **no requirement** in the WLAD or the administrative code that requires an individual to go through the rule making process prior to initiating a lawsuit. Nor does the WLAD require administrative exhaustion prior to commencing a WLAD suit.

¶57 Further, here, there was no reason for the lower court to apply the primary jurisdiction doctrine and defer to the Human Rights Commission. The court was not presented with any overly complex technological terms or subject areas that the Human Rights Commission would have been more adept at addressing. Indeed, Cinemark and Regal's adoption of the new digital projection and caption technology demonstrated that compliance with the WLAD was technologically possible and monetarily feasible. Thus, the court did not abuse its discretion when it declined to refer the questions in this case to the Human Rights Commission.

¶58 The theaters do not cite to any WLAD cases from this state that would support their contention that the lower court's ruling is somehow a violation of the APA, the WLAD itself, or the doctrine of primary jurisdiction. They do cite to several federal cases that address the "line of sight" issue discussed above.[98] But, in those cases, the courts were addressing the failure of the Department of Justice *itself* to go through the proper rule making process, **not** the inability of a court to interpret the ADA and analyze what constitutes proper accommodations.

---

[96] WAC 30-12-037.

[97] WAC 162-08-610.

[98] *United States v. Hoyts Cinemas Corp.*, 256 F. Supp. 2d 73 (D. Mass. 2003), *vacated* 380 F.3d 558 (1st Cir. 2004); *Or. Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 142 F. Supp. 2d 1293 (D. Or. 2001), *rev'd*, 339 F.3d 1126 (9th Cir. 2003).

¶59 The theaters also rely on *Hoctor v. United States Department of Agriculture*[99] and on *Caruso v. Blockbuster-Sony Music Entertainment Centre.*[100] But these cases are unhelpful. In both, individuals had been improperly punished for violating administrative rules that had not been properly promulgated.[101] Here, the theaters challenge a different process entirely: the judicial process. The courts have a duty to interpret statutes promulgated by the legislature. There simply is no requirement in this case for the court to have deferred to an administrative agency.

¶60 Finally, the theaters point to *Washington Education Ass'n v. Public Disclosure Commission*, arguing that it demonstrates the kind of rule making that would have been proper here.[102] But, as we have explained above, no such rule making was required or necessary here.

## MOOTNESS

¶61 Regal and Cinemark argue that the trial court erred when it refused to dismiss WashCAP's claims for declaratory relief against them as moot. We disagree.

¶62 A case is moot where "it involves only abstract propositions or questions, the substantial questions in the trial court no longer exist, or a court can no longer provide effective relief."[103] The controversy at issue in the litigation must be "definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as

---

[99] 82 F.3d 165 (7th Cir. 1996).

[100] 968 F. Supp. 210 (D.N.J. 1997), *aff'd in part, rev'd in part on reh'g*, 193 F.3d 730 (3d Cir. 1999).

[101] *Caruso*, 968 F. Supp. at 214-15; *Hoctor*, 82 F.3d at 171-72.

[102] 150 Wn.2d 612, 80 P.3d 608 (2003).

[103] *Spokane Research & Def. Fund v. City of Spokane*, 155 Wn.2d 89, 99, 117 P.3d 1117 (2005) (citing *Westerman v. Cary*, 125 Wn.2d 277, 286, 892 P.2d 1067 (1994)).

distinguished from an opinion advising what the law would be upon a hypothetical state of facts."[104] "Voluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' "[105] Mootness, like other questions of justiciability, is a question of law reviewed de novo.[106]

¶63 A case is justiciable if there is

"(1) . . . an actual, present and existing dispute, or the mature seeds of one . . . (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."[107]

¶64 Here, Regal and Cinemark do not appear to dispute factors (2), (3), or (4). But, they claim that after they adopted closed captioning in their theaters, the dispute was no longer "present and existing."

¶65 Similarly, in *Spokane Research & Defense Fund v. City of Spokane*,[108] the city argued that once it disclosed the documents to which the appellant was seeking access, the case was no longer present and existing and was moot.[109] The supreme court disagreed.[110] It held that

---

[104] *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41, 57 S. Ct. 461, 81 L. Ed. 617 (1937) (citations omitted).

[105] *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719, 127 S. Ct. 2738, 168 L. Ed. 2d 508 (2007) (alteration in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Sciences (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)).

[106] *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 29, 891 P.2d 29 (1995).

[107] *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001) (first alteration in original) (quoting *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)).

[108] 155 Wn.2d 89, 117 P.3d 1117 (2005).

[109] *Id.* at 101-02.

[110] *Id.* at 93.

because Spokane never agreed that disclosures were required under the public disclosure act, former ch. 42.17 RCW (2002), the case was not moot.[111]

¶66 Further, an analogous federal case has upheld the exact actions of the trial court here. In *Feldman v. Pro Football, Inc.*,[112] fans of the Washington Redskins who are deaf and hard-of-hearing sued Pro Football, the owner of the team, for failing to provide equal access to information and announcements in the stadium.[113] After it was sued, Pro Football began captioning certain aural content and providing the majority of the captioning the plaintiff's had requested.[114] But, the defendant still argued that this captioning was not required by the ADA.[115] Consequently, the district court held that the issue was not moot. "[N]othing in the record indicates that Defendants['] actions have resulted in permanent changes. Thus, the Court finds that Defendants have not met their burden of showing that their voluntary actions mooted the case."[116] The Fourth Circuit affirmed the district court's holding, stating that "[w]hile we commend defendants for providing most of the relief that plaintiffs requested . . . we agree with the district court that the defendants have not discharged their heavy burden of showing no reasonable expectation that they will repeat their alleged wrongs."[117]

¶67 Here, as in *Spokane Research* and *Feldman*, the legal question of WLAD's requirements was still a present and existing controversy, even after the theaters adopted

---

[111] *Id.* at 101-02.

[112] 579 F. Supp. 2d 697 (D. Md. 2008), *aff'd*, 419 F. App'x 381, 2011 WL 1097549, 2011 U.S. App. LEXIS 6188 (4th Cir. Mar. 25, 2011) (unpublished).

[113] *Id.* at 699.

[114] *Id.*

[115] *Id.* at 702-03.

[116] *Id.* at 706-07.

[117] *Feldman*, 419 F. App'x at 387, 2011 WL 1097549, at *5, 2011 U.S. App. LEXIS 6188, at *13-14.

the closed captioning equipment. The trial court did not err when it denied Cinemark's motion to the contrary. Though Regal and Cinemark both installed closed captioning equipment, they never recognized that such accommodation was required under the WLAD. Thus, declaratory relief was not moot.

¶68 Further, the claims against Cinemark and Regal involve matters of "continuing and substantial public interest."[118]

[A court] may decide a moot issue if it involves matters of continuing and substantial public interest. To determine whether a case involves the requisite public interest, we consider (1) the public or private nature of the question presented, (2) the desirability of an authoritative determination to provide future guidance to public officers, and (3) the likelihood that the question will recur.[119]

¶69 The issue before the trial court met these three criteria. The WLAD contains strong wording regarding the importance of eliminating discrimination.[120] There are other theaters and other hard-of-hearing customers in the state, and thus a determination for those communities is desirable. Similarly, there is a high probability that this question will recur in other areas of the state. These facts support the application of the public interest exception to the mootness doctrine, assuming this doctrine applied.

¶70 Regal argues that the trial court did not mention the public interest exception or make any findings that these exceptions applied. Thus, Regal contends that we may not rely on this doctrine in affirming its conclusion. But, we

---

[118] *In re Pers. Restraint of Mines*, 146 Wn.2d 279, 285, 45 P.3d 535 (2002).

[119] *Thomas v. Lehman*, 138 Wn. App. 618, 622, 158 P.3d 86 (2007) (citation omitted) (citing *Mines*, 146 Wn.2d at 285).

[120] *See* RCW 49.60.010 (noting that discrimination "threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state").

can affirm on any basis presented in the pleadings and record.[121]

¶71 Regal and Cinemark point to a number of federal cases in which the courts have held a plaintiff's claim moot because the defendant had remedied the alleged violation. But in all of those cases, the defendants altered physical structures that had originally constituted ADA violations.[122] Thus, the courts found that there was little basis for concluding that the plaintiffs would be subject to recurring discrimination. That is not the case here.

¶72 Regal and Cinemark's prior conduct toward deaf and hard-of-hearing customers is capable of repetition. They could cease showing movies with closed captioning or cease notifying individuals that closed captioning is an option. Thus, there was a "basis for concluding that these plaintiffs" would again be subjected to the "same alleged wrongful conduct" given the lack of acceptance by the defendants that captions were legally required.[123]

¶73 Regal argues that "the mere fact of an ongoing disagreement about the law is insufficient to create a

---

[121] *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

[122] *Kemper v. Sacramento Radiology Med. Grp.*, 2007 WL 2481938, 2007 U.S. Dist. LEXIS 66380 (E.D. Cal. Aug. 28, 2007) (Order) (dismissing the case as moot because defendant had brought site into full ADA compliance and no basis for concluding that plaintiff would again be subject to discrimination); *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134 (S.D. Cal. 2006) (concluding that two barriers identified by plaintiff had been remedied and because there was no risk of continuing discrimination, plaintiff's ADA claims were moot); *Harris v. Chico Nissan, Inc.*, 2005 WL 3287236, 2005 U.S. Dist. LEXIS 30816 (E.D. Cal. Dec. 1, 2005) (Memorandum and Order) (defendant's alteration of all physical barriers mooted plaintiff's claims); *Pickern v. Best W. Timber Cove Lodge Marina Resort*, 194 F. Supp. 2d 1128 (E.D. Cal. 2002) (concluding that Timber Cove's alteration of bathrooms and other nonaccessible spaces brought the facility into ADA compliance and mooted plaintiff's claims).

[123] *Indep. Living Res. v. Or. Arena Corp.*, 982 F. Supp. 698, 771 (D. Or. 1997) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982)), *supplemented by* 1 F. Supp. 2d 1159 (D. Or. 1998).

'continuing justifiable controversy.' " It relies on *Halkin v. Helms*,[124] but this case does not support its argument.

¶74 In *Halkin*, the court recognized that if recurrence of an event is possible, especially "where the parties are involved in an ongoing relationship that may present the opportunity for future disagreement . . . an adjudication may be appropriate."[125] The court did conclude that a finding of mootness may be appropriate where recurrence of an event was "so remote and speculative that there was no tangible prejudice to the existing . . . parties . . . ."[126] But that is not the case here.

## RIPENESS

¶75 AMC argues that the trial court erred by adjudicating WashCAP's injunctive claims against it. We again disagree.

¶76 Claims are ripe for judicial review "if the issues raised are primarily legal and do not require further factual development, and the challenged action is final."[127] The purpose of the ripeness doctrine, like other justiciability doctrines, is to "prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies and to protect agencies from judicial interference until an administrative decision has been finalized."[128]

---

[124] 690 F.2d 977 (D.C. Cir. 1982).

[125] *Id.* at 1007.

[126] *Id.* at 1008 (quoting *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 123, 94 S. Ct. 1694, 40 L. Ed. 2d 1 (1974)).

[127] *Neighbors & Friends of Viretta Park v. Miller*, 87 Wn. App. 361, 383, 940 P.2d 286 (1997) (citing *First Covenant Church v. City of Seattle*, 114 Wn.2d 392, 400, 787 P.2d 1352 (1990)).

[128] *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)).

Ripeness is a question of law an appellate court reviews de novo.[129]

¶77 Here, at the time of trial, AMC had not yet completed conversion of its King County movie theaters to digital projection. Consequently, it had not yet selected digital captioning equipment or "made a final decision regarding the amount of movie theaters it will equip with the new captioning equipment." Thus, unlike Regal and Cinemark, it had neither complied with the provisions of the WLAD regarding accessibility in areas of public accommodation nor accepted that such compliance was legally necessary. Thus, both injunctive and declaratory relief claims against AMC were ripe for review.

¶78 Nor was this ripeness defeated by AMC's failure to adopt digital projection. Because closed captioning technology exists for theaters using film projection, AMC's use of film projection does not alter its duty under the WLAD. Nor would its conversion to digital projection change the requirement that it comply with this law.

¶79 AMC analogizes this case to *McInnis-Misenor v. Maine Medical Center*,[130] but this comparison is unhelpful. There, McInnis-Misenor sued Maine Medical for violation of the ADA and sought an injunction to force Maine Medical to alter its facilities for wheelchair-bound pregnant women.[131] The court held that the case was not ripe because when she sued Maine Medical, McInnis-Misenor was not yet pregnant and, as the court noted, "[T]here is no way of knowing when, if ever, McInnis-Misenor will become pregnant . . . ."[132]

¶80 In contrast, here, the plaintiffs represent a group of individuals who are and will continue to be hard-of-hearing

---

[129] *Estate of Friedman v. Pierce County*, 112 Wn.2d 68, 75-76, 768 P.2d 462 (1989).

[130] 319 F.3d 63 (1st Cir. 2003).

[131] *Id.* at 66.

[132] *Id.* at 72-73.

and deaf. Though AMC may choose different methods with which to comply with the WLAD, the fact that it is in the midst of the digitalization of its theaters and awaiting the Department of Justice's potential new rules regarding captions does not change the requirement that it must comply.

## DISMISSED DEFENSES

¶81 The theaters argue that the trial court erred by "summarily dismissing" their "defenses": that they voluntarily provided captioning both before and after their digital conversion, and thus complied with the WLAD. We disagree.

¶82 This court reviews a trial court's conclusions of law de novo to determine whether they are supported by its findings of fact.[133] Findings of fact must be supported by substantial evidence in the record.[134]

¶83 The theaters appear to argue that the trial court's failure to enter findings that they provided closed captioning in their theaters was reversible error. But they fail to support this claim, that it is reversible error for a trial court to "refuse" to enter a particular finding of fact, with citation to any authority. Thus, we assume they could find none.[135] Further, the issue before the court was *not* whether the theaters had taken all actions reasonably possible, but whether they were *required* to under the WLAD. Consequently, the trial court's "refusal" to enter findings of fact as to the theaters' reasonable compliance was not error.

## DECLARATORY RELIEF

¶84 The theaters argue that the trial court erred by awarding declaratory relief to WashCAP under the WLAD,

---

[133] *In re Marriage of Zier*, 136 Wn. App. 40, 45, 147 P.3d 624 (2006).

[134] *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

[135] *State v. Young*, 89 Wn.2d 613, 625, 574 P.2d 1171 (1978).

contending that such relief is not permitted under this statute. We disagree.

██ ██ ¶85 Statutory interpretation is a question of law that this court reviews de novo.[136] RCW 49.60.030(2) provides:

> Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees or *any other appropriate remedy authorized by this chapter or the United States Civil Rights Act of 1964* as amended, or the Federal Fair Housing Amendments Act of 1988.[137]

¶86 Under the Civil Rights Act of 1964 a plaintiff may seek "preventive relief, including an application for a permanent or temporary injunction . . . or other order."[138] Though this act does not provide explicitly for declaratory relief, cases construing it have.[139] Thus, in *Kral v. King County*, the federal district court of Western Washington held that summary judgment was not appropriate under the ADA where injunctive relief was moot but declaratory relief was still available.[140]

---

[136] *Pac. Cont'l Bank v. Soundview 90, LLC*, 167 Wn. App. 373, 379, 273 P.3d 1009 (2012).

[137] (Emphasis added.)

[138] 42 U.S.C. § 2000a-3(a).

[139] *See Feldman*, 419 F. App'x 381, 2011 WL 1097549, 2011 U.S. Dist. LEXIS 6188 (granting declaratory relief where injunctive relief was moot); *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 316 (4th Cir. 2005) (noting that in the context of employment discrimination brought under the Civil Rights Act of 1964, "if an employer can demonstrate that it 'would have taken the same action in the absence of the impermissible motivating factor,' it can restrict a plaintiff's damages to injunctive and *declaratory* relief" (quoting 42 U.S.C. § 2000e-5(g)(2)(B))); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1202-03 (11th Cir. 1999) (noting that under section 601 of Title VI of the Civil Rights Act of 1964, "a plaintiff may obtain injunctive or declaratory relief").

[140] 2012 WL 726901, at *7-8, 2012 U.S. Dist. LEXIS 29883, at *22-24 (W.D. Wash. Mar. 6, 2012) (Order Re: Pending Motions for Summary Judgment).

¶87 Here, the trial court entered the following conclusion of law:

WLAD specifically permits the Court to issue all remedies provided by the Civil Rights act of 1964. The portion of that Act dealing with public accommodations permits injunctions, damages, and "other orders." That same remedy provision is also incorporated into Title III of the Americans with Disabilit[ies] Act. Moreover, the mandate that the WLAD be interpreted liberally for the accomplishment of its purpose supports the authority to grant declaratory relief. The purposes of the law would be frustrated if declaratory relief were not permitted.[141]

This is correct. The Civil Rights Act provided for "other orders," including declaratory relief, and the relief provided by this act was incorporated into the WLAD.

¶88 The theaters argue that because the protections of the Civil Rights Act of 1964 do not extend to disabled persons, the relief it provides does not extend to these groups either. But this is a misreading of the plain language of RCW 49.60.030(2). That statute did not limit the *injuries or people covered* by the WLAD, but, rather, details the *remedies* available to WLAD plaintiffs.

¶89 Additionally, the theaters cite to a number of federal cases that they argue support their contention that the WLAD, like the ADA, does not provide for declaratory relief. But they misread these cases, which are generally focused on denying any claims for *damages* under the ADA, rather than addressing the possibility of declaratory relief.[142] Thus, the theaters' argument that neither the ADA nor, analogously, the WLAD provides for declaratory relief fails.

---

[141] Clerk's Papers at 1523.

[142] *See Morrison v. Unum Life Ins. Co. of Am.*, 2008 WL 4224807, 2008 U.S. Dist. LEXIS 68253 (W.D. La. Sept. 10, 2008) (Reasons for Judgment) (noting that the plaintiff could not demand damages in an action under the ADA); *United States v. York Obstetrics & Gynecology, PA*, 2000 WL 1221625, 2000 U.S. Dist. LEXIS 12564 (D. Me. Aug. 25, 2000) (Memorandum Decision on Defendant York Obstetrics & Gynecology, P.A.'s Motions for Summary Judgment) (resting its denial of declaratory relief on the failure of the plaintiff's claim to reference declaratory relief).

██ ¶90 Finally, the theaters argue that even if declaratory relief is available under the WLAD, the court should more properly have awarded such relief under the Uniform Declaratory Judgment Act (UDJA), chapter 7.24 RCW. It is true that Washington courts are reticent to grant declaratory relief when other remedies are specified by law.[143] But the UDJA is not the "sole method" for obtaining declaratory relief, as demonstrated above.

¶91 Nor is the theaters' citation to *Pasado's Safe Haven v. State*[144] helpful. There, Pasado's brought a UDJA action and a " 'taxpayer derivative suit,' " also seeking declaratory relief.[145] The court noted that the UDJA is the "only action" for a declaratory judgment.[146] But, as noted above, this statement was incorrect. The WLAD also provides an avenue for declaratory relief. Thus, the trial court did not err.

## ATTORNEY FEES

¶92 The theaters argue that any award of attorney fees to WashCAP was improper and that the amount of the award was an abuse of discretion. We disagree with both arguments.

██ ██ ¶93 Generally, "attorney fees may be awarded when authorized by a contract, a statute, or a recognized ground in equity."[147] Whether attorney fees were authorized on one of these three grounds is a question of law we review de novo.[148] A secondary question is the amount of

---

[143] 15 KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 42:6 (2d ed. 2009).

[144] 162 Wn. App. 746, 259 P.3d 280 (2011).

[145] *Id.* at 750.

[146] *Id.* at 752 n.4.

[147] *Kaintz v. PLG, Inc.*, 147 Wn. App. 782, 785, 197 P.3d 710 (2008) (citing *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 849-50, 726 P.2d 8 (1986)).

[148] *Id.* at 785-86.

attorney fees awarded.[149] We review this question for an abuse of discretion.[150]

## Award of Attorney Fees at Trial

¶94 The theaters contend that the trial court erred for two reasons when it awarded attorney fees to WashCAP. First, they argue that the trial court granted declaratory relief proper only under the UDJA, and because the UDJA does not provide for attorney fees, the grant of attorney fees was error. Second, they contend that WashCAP was not the prevailing party and thus not entitled to any attorney fees. They are wrong on both counts.

¶95 RCW 49.60.030(2) of the WLAD provides for the award of reasonable attorney fees and costs. In contrast, RCW 7.24.100 of the UDJA does not provide for an attorney fee award to the prevailing party.

¶96 Here, the trial court granted WashCAP's motion for declaratory relief against Regal, Cinemark, and AMC. It also granted injunctive relief with respect to AMC. The defendants do not argue that attorney fees were inappropriate with respect to the injunctive relief. But, they argue that because a declaratory judgment was proper only under the UDJA, no attorney fee award was proper with respect to Regal or Cinemark. As we explained above, however, the WLAD authorizes a court to grant a declaratory judgment. Thus, Regal's argument is without merit.

¶97 Even if the award of declaratory relief was proper only under the UDJA, it was not error for the court to also award attorney fees under WLAD. Here, the WLAD was the underlying statute upon which the court based its final judgment. The supreme court in *Seattle School District No. 1 v. State* noted that it has "consistently refused to award

---

[149] *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 538, 151 P.3d 976 (2007).

[150] *Id.*

attorneys' fees as part of the cost of litigation *in the absence of a* contract, *statute*, or recognized ground in equity."[151] There, the only statute under which the Seattle School District sought relief was the UDJA, and thus no statute provided for an award of attorney fees. But, here, the statute underlying the litigation, the WLAD, explicitly does provide for an award.

¶98 The theaters' other central argument with regard to the award of fees is that because the trial court did not find that WashCAP's members were injured or that the WLAD was violated, WashCAP was not the prevailing party. Thus, Regal argues, WashCAP was not entitled to attorney fees.

¶99 It is unclear from the theaters' briefing whether it is making this argument as to the fees assigned to all three theaters or only to those allocated to Regal and Cinemark. Regardless, we disagree.

■■■ ¶100 Generally, a plaintiff must prove four criteria to establish a prima facie case of discrimination under the WLAD:

"(1) they have a disability recognized under the statute; (2) the defendant's business or establishment is a place of public accommodation; (3) they were discriminated against by receiving treatment that was not comparable to the level of designated services provided to individuals without disabilities by or at the place of public accommodation; and, (4) the disability was a substantial factor causing the discrimination."[152]

No WLAD case, however, requires that a court make an *express* determination that the defendant violated the WLAD or that the plaintiffs were injured.

¶101 Here, in granting declaratory judgment against Regal and Cinemark, the court stated the prima facie case for discrimination under the WLAD, rejecting the theaters' defenses. It concluded that the defendant movie theaters

---

[151] 90 Wn.2d 476, 540, 585 P.2d 71 (1978) (emphasis added).

[152] *Fell*, 128 Wn.2d at 637 (footnote omitted) (quoting RCW 49.60.215).

are places of public accommodation and that hearing loss is a sensory disability under the WLAD. Thus, it explicitly concluded that WashCAP proved the first two prongs of a WLAD prima facie case. The court went on:

6. Defendants provide the same service to Plaintiff's members as they provide to other patrons. However, providing Plaintiff's members with the same service as is provided to non-disabled patrons does not permit Plaintiff's members to fully enjoy movies at Defendants' theaters because they are unable to understand some or all of the dialogue and other aural information.

7. Because "same service" does not allow Plaintiff's members to fully enjoy the movies, Defendants are required to offer "reasonable accommodation" instead of "same service." WAC 162-26-080.[153]

Though the above conclusions do not state explicitly that WashCAP's members were injured, they do make clear that prior to the installation of captioning capability in every theater, Regal and Cinemark *did not* provide reasonable accommodation to hard-of-hearing and deaf individuals. Though the court did not explicitly state that WashCAP members "were discriminated against," its conclusions of law said essentially the same thing. Further, these conclusions made clear that such discrimination was a result of the plaintiff's members' auditory disabilities. The court then made explicit what changes were necessary to comply with the WLAD:

11. Defendants are required by the WLAD to offer captioning, or another equally effective method of making soundtracks understandable, to the extent it is reasonably possible in the circumstances for each Defendant to do so.

12. By equipping all of their King County multiplexes that are the subject of this litigation to enable them to show closed-captions for all films for which captions have been prepared, and by committing to maintain that equipment,

---

[153] Clerk's Papers at 1523-24.

properly train staff in its operation, and by committing to publicizing their closed-captioned offerings, Defendants Regal and Cinemark have taken all steps reasonably possible in the circumstances to make their movie soundtracks understandable.[154]

Thus, the trial court's conclusions of law implicitly concluded that the theaters had violated the WLAD and that those with the hearing disability were injured by this violation.

¶102 *Spokane Research*, a public disclosure act case, supports our conclusion that attorney fees were appropriate here. There, the court held that though the plaintiffs received the documents they sought prior to the conclusion of trial, they were still entitled to a declaratory judgment and attorney fees.[155] The defendants did not recognize the plaintiffs' legal claim, and thus a ruling was necessary to clarify the plaintiffs' right.[156] With this ruling, the plaintiffs were entitled to attorney fees.[157] As the court in *Spokane Research* noted, the argument that the plaintiffs were not entitled to fees was "the mootness argument in another garb."[158] The supreme court went on to note that such a holding on fees would allow "government agencies to resist disclosure of records until a suit is filed and then to disclose them voluntarily to avoid paying fees and penalties."[159]

¶103 Regal attempts to distinguish *Spokane Research*. It points out that the public disclosure act allows for an award of penalties for every day that the disclosure is unlawfully denied. Thus, it argues, the court "was not addressing

---

[154] *Id.* at 1524.

[155] *Spokane Research*, 155 Wn.2d at 100-01.

[156] *Id.* at 101.

[157] *Id.*

[158] *Id.* at 103.

[159] *Id.*

attorney's fees, nor was it dealing with a case where the plaintiff itself acknowledged that its initial claim was mooted . . . ."

¶104 A plain reading of the decision undercuts this argument. The court mentioned attorney fees *and* costs.[160] Furthermore, the fact that WashCAP acknowledged that its injunctive claim was moot does nothing to change the court's general conclusions regarding the WLAD.

¶105 Regal cites *Dezell v. Day Island Yacht Club*[161] to support its argument that the court should not have awarded WashCAP attorney fees because it did not make an explicit finding that the theaters had violated the WLAD. But, *Dezell* is unhelpful.

¶106 There, Dezell sued Day Island, a private club, for sex discrimination.[162] Day Island argued that *it* should be awarded attorney fees, but the court noted that "[t]he Club was not a plaintiff in the action below and was not *injured* by a violation of the [WLAD]. As such, it may not recover attorneys' fees on this ground."[163]

¶107 Here, WashCAP is clearly the plaintiff. And, the trial court *did* conclude that the other defendants were not providing "reasonable accommodation" under the WLAD prior to installation of closed captioning devices.

¶108 Regal also relies on *O'Neill v. City of Shoreline*[164] for the principle that when a plaintiff seeks attorney fees for a statutory claim, it must show an actual violation of the statute, not "merely establish a general duty to comply with some provision of the statute."

---

[160] *Id.* at 100-02.

[161] 796 F.2d 324 (9th Cir. 1986).

[162] *Id.* at 326.

[163] *Id.* at 329 (citations omitted).

[164] 170 Wn.2d 138, 240 P.3d 1149 (2010).

¶109 There, O'Neill sued Shoreline under the Public Records Act.[165] The supreme court held that the court of appeals had improperly awarded attorney fees to O'Neill because the court of appeals **did not find** that Shoreline had violated the Public Records Act.[166] Here, however, the trial court **did** grant declaratory relief and found that defendant movie theaters had to display captions to comply with the WLAD. Thus, fees were appropriate.

### Amount of Fee Award at Trial

¶110 Finally, the theaters argue that the trial court's award of attorney fees and fee multiplier was an abuse of discretion. We disagree.

¶111 The reasonableness of an attorney fee award is reviewed on appeal for an abuse of discretion.[167] Generally, an appellate court will not disturb a trial court's award of attorney fees unless the trial court abused its discretion.[168] The party challenging the trial court's decision bears the burden of demonstrating that the award was clearly untenable or manifestly unreasonable.[169]

¶112 First, the theaters argue that the trial court's award of attorney fees was improper because it did not award WashCAP all the relief it had originally sought. This is incorrect.

¶113 The calculation of reasonable attorney fees begins with the "lodestar," "the number of hours reasonably

---

[165] *Id.* at 143-44.

[166] *Id.* at 152.

[167] *224 Westlake, LLC v. Engstrom Props., LLC*, 169 Wn. App. 700, 734, 281 P.3d 693 (2012) (citing *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983)).

[168] *Eagle Point Condo. Owners Ass'n v. Coy*, 102 Wn. App. 697, 715, 9 P.3d 898 (2000) (citing *In re Marriage of Crosetto*, 82 Wn. App. 545, 563, 918 P.2d 954 (1996); *Schmerer v. Darcy*, 80 Wn. App. 499, 509, 910 P.2d 498 (1996)).

[169] *Crosetto*, 82 Wn. App. at 563 (quoting *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994)).

expended on the litigation multiplied by a reasonable hourly rate."[170] In *Hensley v. Eckerhart*, the United States Supreme Court noted that a trial court should consider the results obtained in its attorney fee calculation.[171] It went on:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants . . . counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved."[172]

But, the Court then noted that

> [m]any civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a **common core of facts** or will be **based on related legal theories**. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims.[173]

¶114 Here, WashCAP was the prevailing party—its demand for declaratory relief was granted. Its demand for injunctive relief was deemed moot with respect to Regal and Cinemark only because those theaters moved during litigation to adopt WLAD-compliant accommodations. Nor were WashCAP's initial claims for injunctive relief based on separate facts or legal theories. Thus, the trial court did not abuse its discretion in determining the amount of its fee award.

---

[170] *224 Westlake*, 169 Wn. App. at 734.

[171] 461 U.S. 424, 434, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).

[172] *Id.* at 434-35 (quoting *Davis v. County of Los Angeles*, 8 Empl. Prac. Dec. (CCH) ¶ 9444, at 5049 (C.D. Cal. 1974)).

[173] *Id.* at 435.

¶115 The theaters also argue that the trial court abused its discretion when it applied an upward multiplier to the attorney fees. We disagree.

¶116 In contingency cases such as those brought under the WLAD, Washington courts have recognized that the prospect of an upward adjustment is an important tool in encouraging litigation.[174] This is particularly true in the context of the WLAD, which "places a premium on encouraging private enforcement."[175] To determine whether a multiplier is appropriate, the trial court looks to the "contingent nature of success, and the quality of work performed."[176] The potential for success must be assessed by the trial court at the outset of litigation.[177]

¶117 Here, as WashCAP points out, at the outset of litigation only one court in the nation had recognized that captions were required under the ADA.[178] The majority of courts had found otherwise.[179] Nor were there many analogous cases in Washington upon which WashCAP could draw comparisons. Thus, the suit was highly contingent. And, as noted above, WashCAP was as successful as it could have been given the conversion of Cinemark's and Regal's theaters during the litigation. Thus, the trial court did not abuse its discretion in awarding a fee multiplier.

¶118 The theaters argue that WashCAP's suit against them was not highly contingent because the organization knew that the theaters were planning to covert to digital projection in the near future. But it is not clear why the

---

[174] *Bowers*, 100 Wn.2d at 598-99.

[175] *Chuong Van Pham*, 159 Wn.2d at 542 (citing RCW 49.60.020; *Martinez v. City of Tacoma*, 81 Wn. App. 228, 235, 914 P.2d 86 (1996)).

[176] *Bowers*, 100 Wn.2d at 598.

[177] *Chuong Van Pham*, 159 Wn.2d at 542.

[178] *Ball*, 246 F. Supp. 2d 17.

[179] *Cornilles*, 2002 WL 31440885, 2002 U.S. Dist. LEXIS 7025; *Todd*, 2004 WL 1764686, 2003 U.S. Dist. LEXIS 25317.

potential for digital conversion made WashCAP's claims under the WLAD less contingent and risky. Digital conversion, while making closed captioning easier for movie theaters, did not itself convince the trial court that captioning was required under the WLAD. Thus, the theaters' argument is unpersuasive.

## Fees on Appeal

¶119 WashCAP seeks attorney fees and costs on appeal, as provided for under RAP 18.1 and the WLAD. Because WashCAP is the prevailing party on appeal, it is entitled to such an award.

## POSTJUDGMENT INTEREST

¶120 After we filed our original decision in this case, WashCAP, pursuant to RCW 4.56.110(4), moved for an award of postjudgment interest on attorney fees awards. It seeks such interest both on the fee award by the trial court and the fee award by this court. Exercising our discretion to interpret liberally the Rules of Appellate Procedure to promote justice and facilitate our decision on the merits,[180] we treat this motion as a timely motion for reconsideration of our original decision.[181]

¶121 The trial court awarded WashCAP attorney fees plus interest "as specified by law." Neither WashCAP nor Regal sought clarification of what specific rate of interest should be applied to the judgment after the trial court's ruling. Nor did either party brief this issue on appeal.

¶122 At issue is what rate of interest under RCW 4.56.110 should be applied to the two awards. There is nothing to suggest the rate should be any different on appeal than it should be at trial.

---

[180] RAP 1.2.

[181] RAP 12.4.

 ¶123 Regal argues that we may not reach the merits of WashCAP's motion as this court is not the proper venue for a determination of postjudgment interest. But we may affirm the trial court on any ground supported by the record.[182] Thus, even if the trial court itself did not specify what rate of postjudgment interest should apply, we may do so within our determination of what rate is "specified by law."

 ¶124 The rate of postjudgment interest is defined by RCW 4.56.110. This statute outlines different rates of interest according to the nature of the judgment in question. RCW 4.56.110(1) and (2) apply to judgments for contractual claims and unpaid child support, respectively. Under RCW 4.56.110, interest on judgments shall accrue as follows:

[(3)](b) Except as provided in (a) of this subsection, judgments founded on the tortious conduct of individuals or other entities, whether acting in their personal or representative capacities, shall bear interest from the date of entry at two percentage points above the prime rate, as published by the board of governors of the federal reserve system on the first business day of the calendar month immediately preceding the date of entry. In any case where a court is directed on review to enter judgment on a verdict or in any case where a judgment entered on a verdict is wholly or partly affirmed on review, interest on the judgment or on that portion of the judgment affirmed shall date back to and shall accrue from the date the verdict was rendered.

(4) Except as provided under subsections (1), (2), and (3) of this section, judgments shall bear interest from the date of entry at the maximum rate permitted under RCW 19.52.020 on the date of entry thereof. In any case where a court is directed on review to enter judgment on a verdict or in any case where a judgment entered on a verdict is wholly or partly affirmed on review, interest on the judgment or on that portion of the judgment affirmed shall date back to and shall accrue from the

---

[182] *LaMon*, 112 Wn.2d at 200-01.

date the verdict was rendered. The method for determining an interest rate prescribed by this subsection is also the method for determining the "rate applicable to civil judgments" for purposes of RCW 10.82.090.

Generally, RCW 4.56.110(4) applies to judgments from statutorily based claims. Thus, under RCW 4.56.110(3)(b) and (4), judgments founded on a tort action bear interest at a different rate than those founded on a statutory claim.

¶125 The question, then, is whether a judgment founded on a WLAD claim is in fact a judgment based on tortious conduct or, rather, one that is statutorily based. We hold that it is a judgment founded upon tortious conduct.

¶126 In *Blair v. Washington State University*, the supreme court held that "a discrimination action" should be characterized as a tort.[183] In *Blair*, the trial court ruled that Blair's discrimination suit was a tort and consequently that *he* was required to file a tort claim with the State before bringing *his* suit.[184] The supreme court agreed. "This court has characterized a discrimination action as a tort. Textual analysis, therefore, supports the trial court's application of the RCW 4.92.110 'tortious conduct' to this discrimination action."[185]

¶127 In *Hintz v. Kitsap County*, Division Two of this court echoed the supreme court's holding in *Blair*, applying a prefiling statute for tort claims to a discrimination claim.[186] There, Division Two held that prior to suing Kitsap County for wrongful discrimination, Hintz was required to file a notice of claim for damages as required for

---

[183] 108 Wn.2d 558, 576, 740 P.2d 1379 (1987) (citing *Anderson v. Pantages Theatre Co.*, 114 Wash. 24, 194 P. 813 (1921)).

[184] *Id.*

[185] *Id.* (citation omitted).

[186] 92 Wn. App. 10, 12-13, 960 P.2d 946 (1998).

all *tort claims* brought against local government entities and their agents by RCW 4.96.020.[187]

¶128 Finally, Division Three, in *Valdez-Zontek v. Eastmont School District*, held that the proper post-judgment interest for fees awarded on a WLAD claim was defined by RCW 4.56.110(3).[188] There, Valdez-Zontek made the same argument as WashCAP makes here, contending that her WLAD claims were statutory and thus not governed by RCW 4.56.110(3) but rather by RCW 4.56-.110(4).[189] Division Three rejected this argument, holding that all WLAD damages sound in tort.[190]

¶129 Here, the judgment for WashCAP for attorney fees was based entirely on its WLAD claim. The award on appeal is based on our affirmance of that judgment. Under *Blair*, *Hintz*, and *Valdez-Zontek*, this action is properly characterized as one arising in tort. Thus, the proper postjudgment interest for the fees awarded at trial and here on appeal is defined by RCW 4.56.110(3)(b). Specifically, interest, both on the judgment and on the fees on appeal, "shall bear interest from the date of entry at two percentage points above the prime rate, as published by the board of governors of the federal reserve system on the first business day of the calendar month immediately preceding the date of entry."[191]

¶130 WashCAP argues that although its underlying claim may have arisen out of the defendants' tortious conduct, the judgment for attorney fees is founded on a statute, and consequently RCW 4.56.110(4) applies. We disagree.

---

[187] *Id.*

[188] 154 Wn. App. 147, 173-74, 225 P.3d 339 (2010).

[189] *Id.*

[190] *Id.* at 174 (citing *Blair*, 108 Wn.2d at 576).

[191] RCW 4.56.110(3)(b).

¶131 It relies on *Woo v. Fireman's Fund Insurance Co.*[192] to support this argument, but that case is not helpful. There, this court held that where a judgment is based on *multiple* claims, a court must look to the primary basis for the judgment to determine what postjudgment interest rate applies.[193] But this case is not based on multiple claims. The only claim from which the judgment for attorney fees arose was a WLAD claim. And, thus, the proper postjudgment interest rate is defined by RCW 4.56.110(3)(b).

¶132 We affirm the partial summary judgment, final judgment, and fee award. We also award WashCAP attorney fees on appeal and postjudgment interest, subject to its compliance with RAP 18.1.

BECKER and LAU, JJ., concur.

Review denied at 178 Wn.2d 1010 (2013).

---

[192] 150 Wn. App. 158, 208 P.3d 557 (2009).
[193] *Id.* at 166-67, 173.